# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
May 27, 2015 Session Heard at Cookeville[1]

## STATE OF TENNESSEE
### v.
## THOMAS LEE HUTCHISON

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Knox County**
**No. 88264      Jon Kerry Blackwood, Judge**

_____

### No. E2012-02671-SC-R11-CD – Filed January 14, 2016

_____

A jury convicted the defendant of three counts of facilitation of first degree murder and one count of facilitation of aggravated robbery. The Court of Criminal Appeals affirmed the conviction and the sentence. On appeal to this Court, the defendant contends, *inter alia*, that the admission into evidence of an autopsy report through the testimony of a medical examiner who did not perform the autopsy violated his right to confront the witnesses against him under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. The defendant also argues that the warrantless search of his home by officers who entered the home after the first responding officer constituted an unreasonable search and seizure in violation of the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution, so the trial court should have suppressed the evidence seized in that search. We hold that, under the circumstances of this case, the autopsy report is not testimonial under Williams v. Illinois, 132 S. Ct. 2221 (2012), so its admission into evidence did not violate the Defendant's rights under the Confrontation Clause. We further hold that, where the responding officer's initial entry into the home was justified by exigent circumstances, the subsequent entry into the home by other officers constituted a mere continuation of the initial officer's lawful entry into the home. Consequently, the trial court did not err by denying the Defendant's motion to suppress the evidence that was in plain view and within the scope of the exigent circumstances search. Finally, we hold that the admission into evidence of items that were not in plain view, even if erroneous, constituted harmless error. Accordingly, we affirm.

---

[1] Oral argument was heard on May 27, 2015, at Tennessee Technological University in Cookeville, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed**

HOLLY KIRBY, J., delivered the Opinion of the Court, in which SHARON G. LEE, C.J., and CORNELIA A. CLARK, GARY R. WADE, and JEFFREY S. BIVINS, J.J., joined.

Robert L. Jolley, Jr., and Megan A. Swain, Knoxville, Tennessee, for the appellant, Thomas Lee Hutchison.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General, John H. Bledsoe, Senior Counsel of Criminal Justice Division, Randall Eugene Nichols, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for appellee, the State of Tennessee.

## OPINION

This case involves the February 20, 2002 robbery and murder of Gary Lindsay ("victim") in the home of the defendant in this case, Thomas Lee Hutchison ("Defendant"). The Defendant was indicted for premeditated first degree murder, felony murder, and especially aggravated robbery of the victim. A Knox County jury found the Defendant guilty of three counts of the lesser included offense of facilitation of first degree murder and one count of the lesser included offense of facilitation of especially aggravated robbery. The trial judge merged the facilitation of first degree murder convictions and sentenced the Defendant to seventeen years, and it also sentenced Defendant to a concurrent sentence of eight years on the conviction for facilitation of especially aggravated robbery.

## Facts

The following evidence was presented to the jury at trial. On February 20, 2002, at approximately 1:19 a.m., an operator with the Knox County Emergency Communications District received a call from Mr. Gene Mitchell regarding an incident at the Defendant's home. Knoxville Police Department (KPD) Officer Josh Shaffer was nearby and responded to the call at approximately 1:23 a.m. When he arrived at the home, Officer Shaffer saw a car that appeared to be exiting the driveway at a high rate of speed. Officer Shaffer pulled into the driveway and blocked the car so that it could not leave. The driver of the car stopped, got out, and yelled to Officer Shaffer, "He's inside! He's inside!" At the same time, two more men ran out of the house yelling, "Inside! He's inside!" Officer Shaffer detained all three men in the carport of the home until a backup officer arrived. Officer Shaffer did not notice whether there was blood on the hands or clothing of the three men detained in the carport.

When other KPD officers and investigators arrived on the scene at approximately 1:28 a.m., Officer Shaffer entered the home. Upon entering, Officer Shaffer encountered the Defendant sitting on the floor of the living room, obviously injured. Officer Shaffer described the Defendant as "disoriented to an extent" and commented that the Defendant's demeanor was consistent with that of someone who had smoked crack cocaine and was coming down off a high. The three men who had been detained in the carport burst into the home behind Officer Shaffer and began yelling at the Defendant. As Officer Shaffer and the other officers pushed the men back outside, the men pointed to an upstairs room and said, "He's in there, he's in there."

After the detained men were ushered back outside, Officer Shaffer went to the indicated upstairs room. There, Officer Shaffer found the victim lying face down in the corner. The victim's head had sustained extensive trauma and his pants were pulled down to his knees. A crowbar with blood and tissue on it, partially wrapped in a comforter, lay next to the body. The walls, ceiling and items in the room had a substantial amount of blood spatter on them. Several items in the room were visibly out of place as if they had been knocked over. Based on the extent of the injuries, it was immediately clear to Officer Shaffer that the victim was deceased.

Because the Defendant was injured, the KPD called an ambulance to take him to the hospital. As other officers and technicians arrived to inspect and process the crime scene, Officer Shaffer accompanied the Defendant to the hospital to ensure the preservation of all evidence associated with the Defendant's person, including his belongings and his clothing.

Meanwhile, at approximately 1:40 a.m., KPD crime scene technician Janice Gangwer arrived on the scene and met with the officers that were already there. She entered the home without a warrant and without the consent of the Defendant. Gangwer began processing the crime scene by making videos, taking photographs, and marking evidence. She photographed certain items, including the bloody crowbar, 0.27 grams of crack cocaine, a crack pipe, and a navy blue sweatshirt. In her testimony, Gangwer observed that the victim's head had been crushed. She described the bedroom as the "scene of a violent attack."

Witness Jim Murray testified that, in 2002, he was an investigator with the KPD Major Crimes Division. On February 20, 2002, investigator Murray arrived at the crime scene around the same time as technician Gangwer, at approximately 1:40 a.m. Officers who were already there briefed Murray when he arrived. After Gangwer took video and photographs, Murray assisted in further processing the crime scene. Murray stated that, during the processing, the officers discovered a wooden knife handle lying on the floor in the room in which the victim was found. The wooden knife handle had the blade broken off and had significant blood on it. Investigator Murray noticed similar knives in the kitchen in the home. Investigator Murray saw that the victim was wearing a gold ring on

- 3 -

one hand. The victim's other hand was covered in blood; the ring area on one finger on that hand had no ring on it but was nevertheless void of blood. This led investigator Murray to suspect that the victim had been wearing a ring on that finger during the fatal assault that was removed after the assault. Investigator Murray later found a gold nugget ring on the vanity in the upstairs bathroom.

After technician Gangwer and investigator Murray finished processing evidence at the Defendant's home, they joined Officer Shaffer at the hospital where the Defendant was being treated to process the evidence there. Gangwer photographed the Defendant's hands and face, with particular attention to blood stains on them. Investigator Murray obtained a search warrant to get samples from the Defendant's hands. After he obtained the search warrant, Murray took swab samples from the Defendant's hands and clippings from his fingernails. They took the clothing that had been removed from the Defendant at the hospital.

Witness Gerald Smith testified that, in 2002, he was a senior evidence technician with the KPD. On February 20, 2002, technician Smith arrived at the crime scene shortly after 2:00 a.m. He testified about his extensive education in bloodstain pattern analysis. Based on his observation of the crime scene and the blood-spatter pattern on the walls, ceiling, and items in the room where the victim was found, Smith concluded that most of the blows to the victim's head had occurred while the victim was prone, lying face down on the carpet.

The jury heard testimony from witness Penny Cox, who was present in the Defendant's home when the murder occurred. Two days before the murder, Ms. Cox said, she was in the Defendant's home with the victim and her friend John Mitchell; she had hoped to rent a downstairs bedroom from the Defendant and she spent that day cleaning the bedroom she planned to rent. The next day, she said, the Defendant, the victim, and John Mitchell were all in the Defendant's home and played cards. While they were playing, the Defendant asked the victim for some crack cocaine; the victim responded by calling the Defendant a "dumb ass." The next day, Ms. Cox said, the Defendant told her that he did not like the victim because he was a "dumb ass," and he had a plan to rob the victim. However, the Defendant did not tell Ms. Cox any details about the alleged robbery plan.

The day of the murder, Ms. Cox testified, she overheard the Defendant on the telephone with someone she assumed was the victim. The Defendant asked the person on the other end of the call to come over to discuss a potential drug sale to a doctor. After that, the victim and John Mitchell showed up at the Defendant's home. Ms. Cox said that when the Defendant, the victim, and John Mitchell began discussing the potential drug deal, she went into the downstairs bedroom to "let them do their talking." The victim and John Mitchell then left the home to get the drugs for the potential sale.

When the victim and John Mitchell returned, the victim went directly to the upstairs bedroom with a pizza. John Mitchell went to the bedroom where Ms. Cox was staying. After Ms. Cox and John Mitchell smoked some crack cocaine, he left, and Ms. Cox went to sleep.

Later, Ms. Cox was awakened by a series of about ten loud thumps. Ms. Cox came out of the downstairs bedroom to see what had caused the noise and saw the Defendant exiting the upstairs bedroom. She testified that the Defendant quickly shut the bedroom door behind him but, before the door shut, she got a glimpse of someone lying on the bedroom floor whom she assumed was the victim. Ms. Cox said that the Defendant's eyes were "wild looking" and he had blood on his shirt and his hands. She said that the Defendant told her that he had killed the victim with a knife.

Ms. Cox testified that she wanted to leave, but the Defendant would not let her. She smoked some crack cocaine and stood around the kitchen, afraid of what the Defendant might do to her if she did not comply with his requests. Ms. Cox said that the Defendant had some money with him and that he offered some to her, but she declined. The Defendant asked Ms. Cox to help him dispose of the victim's body by either chopping it up and burning it in the fireplace or by taking it to a nursery and burying it. Ms. Cox refused. She testified that the Defendant allowed her to call her friend, Kimberly Armas-Trejo, to pick her up. After Ms. Armas-Trejo picked her up, Ms. Cox told Ms. Armas-Trejo what the Defendant had done. Ms. Cox then called John Mitchell's father, Gene Mitchell, to tell him what had happened.

Later, Ms. Cox said, she was taken to the police station and interviewed for several hours. At the police station, Ms. Cox was photographed; she claimed that the clothes she was wearing in the photographs were the same clothes she had worn at the Defendant's house the previous day and that she had not showered or changed clothes in the interim. Ms. Cox testified that she had no blood or brain matter on her at that time. While at the Defendant's house, Ms. Cox said, she did not stab the victim, did not beat him with the crowbar, and did not even go into the room where the victim was killed. Ms. Cox testified that she was not using crack cocaine at the time of trial.

John Mitchell testified that he was the son of Gene Mitchell, the person who told the 9-1-1 dispatcher that there had been an incident at the Defendant's home.[2] John Mitchell said that he had been good friends with both the victim and the Defendant, and that he knew Ms. Cox through his father Gene. John Mitchell explained that the victim sold drugs for a living and that he occasionally sold crack cocaine with the victim. On the day of the offense, John Mitchell drove the victim to the Defendant's home. When they arrived, John Mitchell noted, the Defendant acted "jittery and fidgety" and rushed him to leave. John Mitchell testified that he warned the victim, "Something ain't right,"

_____

[2] John Mitchell testified that his father Gene Mitchell was deceased by the time of trial.

and told the victim that he did not have to stay. The victim declined to leave, and he ordered a pizza. After the pizza arrived and they had eaten, John Mitchell left, telling the victim to call him when he was ready to leave. The victim never called John Mitchell to be picked up.

Later, when the victim did not call, John Mitchell tried to call the victim. The victim's phone had been turned off, which was unusual. John Mitchell then called the Defendant's home telephone repeatedly, to no avail. Finally, the Defendant answered his home phone; in response to John Mitchell's inquiry about the victim, the Defendant told him that the victim had left. The Defendant asked John Mitchell to bring $40 worth of crack cocaine to his home, and Mitchell agreed.

John Mitchell brought his brother with him to the Defendant's home. On the way, they passed their father, Gene Mitchell, who was waving at them frantically, but they did not stop. When John Mitchell and his brother arrived at the Defendant's home, the Defendant came outside and locked his front door behind him. As they were discussing the anticipated drug transaction, Gene Mitchell pulled into the Defendant's driveway. John Mitchell recounted that Gene Mitchell was agitated and scared as he got out of his vehicle. Gene told the Defendant to open the door to his house and blurted out that Ms. Cox had told him that the Defendant had killed the victim.

After Gene Mitchell made the Defendant open the door to his home, John Mitchell entered the home and went to the upstairs room. There he came upon the victim lying on the floor, partially wrapped in a blanket with his shoes sticking out, a crowbar lying on top of him. The victim, John Mitchell recalled, "had no brains in his head. He had a hole in his head." John Mitchell bent down, unwrapped the blanket around the victim, and prayed for the victim's soul.

John Mitchell then left the upstairs bedroom to go get the Defendant. John Mitchell and his brother caught the Defendant and beat him. John Mitchell then called 9-1-1 while his father and brother dragged the Defendant back into the home. John Mitchell handed the telephone to his father; as his father spoke to the 9-1-1 dispatcher, the two brothers beat on the Defendant to make sure he did not leave. John Mitchell claimed that, as he and his brother were beating on the Defendant to subdue him, he asked the Defendant why he killed the victim. He said that the Defendant replied, "I didn't do it by myself." John Mitchell said that he then asked the Defendant who had helped him, but Defendant did not respond.

John Mitchell testified that, when he last saw the victim alive, the victim had a lot of crack cocaine on his person, as well as over $2,000 in cash. After viewing a photograph of the drugs that responding police officers found in the victim's sock, John Mitchell testified that the victim had "[w]ay more" drugs on him before he dropped the victim off at the Defendant's house. John Mitchell identified the gold nugget ring that

investigators found in the bathroom of the Defendant's home as belonging to the victim; he said that the victim customarily wore two rings, the gold nugget ring and another gold one.

The autopsy on the victim was performed the day after the murder, February 21, 2002, by the Knox County medical examiner at that time, Sandra K. Elkins, M.D. The autopsy report contains Dr. Elkins' electronic signature. It notes that KPD crime scene technician Smith and KPD investigator Murray both attended the autopsy. According to technician Smith, he brought the crowbar and the knife handle to the autopsy because Dr. Elkins "requested measurements on those, . . . you know, the size of the crowbar itself, the size of the broken blade on the knife handle, and see if they are consistent with the wounds on the [victim]." Smith took photographs of the victim during the autopsy.

The narrative in the autopsy report states: "This 18 year-old black male sustained multiple blows to the head resulting in fatal brain injuries and stab wounds to the chest resulting in fatal internal injuries." It notes that "a 4.6 inch long portion of the knife blade remains in situ with the tip embedded in the mitral valve of the heart (blade fragment removed and given to Knoxville Police Department)." The autopsy report contains anatomical drawings depicting the victim's injuries, notes from the external examination, and a detailed description of the "massive fractures" to the victim's skull, "massive lacerations" to his brain, and injuries to his lung, heart, liver, and kidney. The cause of death is listed as: "Blunt force head injuries (blows); stab wounds to the chest."

By the time of trial, Dr. Elkins was no longer the Knox County medical examiner, and she did not testify at trial. The autopsy report was admitted into evidence through the testimony of Darinka Mileusnic-Polchan, M.D., the Chief Medical Examiner for Knox and Anderson Counties at the time of trial. Dr. Mileusnic-Polchan testified that she was also an Associate Professor of Pathology at the University of Tennessee and had been employed with the Regional Forensic Center since February 2002. Dr. Mileusnic-Polchan testified at the trial as an expert in forensic and anatomical pathology.

As chief medical examiner, Dr. Mileusnic-Polchan said, her duties include investigating deaths that are sudden or unexpected or due to violence, as well as producing a death certificate as an official record with her opinion on what caused the death and how it occurred. Dr. Mileusnic-Polchan said that she had on numerous occasions testified about autopsy findings made by another medical examiner. She explained that, in performing a forensic autopsy, she has a dual role: (1) to "produce an objective report that states the fact[s]" surrounding the death, and (2) "based on the facts of the case and all the investigation, including the autopsy, to then render [an] expert opinion as to the cause and manner of death." Dr. Mileusnic-Polchan said that, because of turnover in the medical examiner's office and other reasons, testifying about another medical examiner's autopsy findings is "a pretty common occurrence." When called into court, she explained, "whether it's our own case or someone else's case," her job is to

"evaluate all the findings and then render our own opinion as to the cause and manner of death as [an] expert witness." She said that the factual findings are established by the medical examiner who performs the autopsy; Dr. Mileusnic-Polchan's role in giving expert testimony is to "not just regurgitate what I found, but what's my conclusion based on those findings of fact, as to the cause and manner of death."

To formulate her expert opinion in this case, Dr. Mileusnic-Polchan testified, she relied on the autopsy report prepared by Dr. Elkins and the autopsy photographs taken by both Dr. Elkins and KPD technician Smith. Counsel for the Defendant objected to admission into evidence of the autopsy report and the photographs, arguing that the autopsy report was inadmissible hearsay and that admission of Dr. Elkins' autopsy report into evidence violated the Defendant's constitutional right to confront his accuser. The trial court allowed the report into evidence under the public records exception to the hearsay rule. It admitted the photographs into evidence as well. The trial court noted that Dr. Mileusnic-Polchan could rely on the autopsy report as part of the underlying data for her expert opinion; she could not testify about what was in the report but could indicate that she relied on both the report and the photographs in arriving at her conclusions.

Dr. Mileusnic-Polchan reviewed the autopsy photographs for the jury, describing the injuries in the photos and comparing the size and shape of the crowbar to the lacerations in the victim's head. After reviewing the photographs, Dr. Mileusnic-Polchan concluded that the "main cause of death was . . . the injury to the cranium; to the bone, to the skull, and the brain . . . due to blunt force trauma." She opined that the multiple stab wounds were a contributing cause of death. Dr. Mileusnic-Polchan concluded that "[t]he manner of death was homicide."

After reviewing several photographs, Dr. Mileusnic-Polchan gave her conclusions about the circumstances surrounding the victim's death. She said that the knife wounds were consistent with the victim being in a seated position while someone stabbed him in the back from behind. The injuries were further consistent with the victim falling to the ground after the infliction of the knife wounds and being hit with an object such as the crowbar while prone and lying face down on the floor. Dr. Mileusnic-Polchan was unable to say with certainty whether the stab wounds or the head trauma occurred first, only that they occurred at around the same time.

Dr. Mileusnic-Polchan was asked on cross-examination whether the death was the "result of the actions of 1, 2, 3, or even 4 persons?" She responded that she could not make any conclusions on the number of persons involved based on the autopsy. Dr. Mileusnic-Polchan was also asked whether anything in the autopsy led her to conclude that anyone in particular committed the murder. She responded: "No, I could not really tell what particular person did it, and that's not really the role of the medical examiner or the forensic pathologist. Our role is to determine the cause and manner of death, and then confirm the mechanism of death, and then essentially compare our findings to the scene

investigation." In response to questions on cross-examination about the gender of the perpetrator, Dr. Mileusnic-Polchan said that the stab wounds could have been inflicted by any adult, male or female. She observed that the blunt force trauma to the victim's head was "extensive" and "deep" and required a "tremendous amount of effort and force." In light of that fact, Dr. Mileusnic-Polchan said, she "would have a hard time saying it's a female" because she had "never seen a female inflict that degree of trauma." She added the proviso, however, that it depended "on what kind of female we're talking about," specifically, "whether it was some very strong woman with a lot of stamina or—or a male."

At the conclusion of the proof and the deliberations, the jury found the Defendant guilty of the lesser-included offenses of facilitation of first-degree murder, facilitation of murder in perpetration of robbery, facilitation of murder in perpetration of theft, and facilitation of especially aggravated robbery. The trial court merged the facilitation of murder convictions and sentenced the Defendant to seventeen years on those. For facilitation of especially aggravated robbery, the trial court sentenced the Defendant to a concurrent sentence of eight years.

The Defendant appealed to the Court of Criminal Appeals, raising thirteen issues.[3] The Court of Criminal Appeals affirmed. State v. Hutchison, No. E2012-02671-CCA-R3-CD, 2014 WL 1423240, at *1 (Tenn. Crim. App. Apr. 11, 2014), perm. app. granted (Tenn. Oct. 20, 2014). One judge dissented in part from the majority opinion on the issue of whether admission of the autopsy report into evidence violated the Defendant's rights

---

[3] On appeal to the Court of Criminal Appeals, the Defendant raised the following issues:

(1) whether the trial court erred in overruling appellant's motion to suppress evidence seized in an extended warrantless search of his house; (2) whether the trial court erred in allowing the State to introduce video footage of the crime scene; (3) whether the trial court erred in allowing the State to introduce evidence of blood samples taken from appellant without a warrant; (4) whether the trial court erred in admitting prior bad act evidence; (5) whether the trial court erred by allowing testimony regarding evidence that had been destroyed; (6) whether the trial court erred by allowing a medical examiner to testify about an autopsy performed by another medical examiner; (7) whether the trial court erred in denying appellant's three motions for mistrial based on prosecutorial misconduct; (8) whether the trial court erred when it denied appellant's request for a continuance in light of the State's late disclosure of certain evidence; (9) whether the trial court erred by denying appellant's request to strike a witness's testimony when the testimony was internally contradictory; (10) whether the trial court erred by allowing the State to introduce graphic photographs of the victim's injuries; (11) whether the trial court erred in its jury instructions; (12) whether the evidence was sufficient to support appellant's convictions; and (13) whether appellant is entitled to a new trial due to cumulative error.

State v. Hutchison, No. E2012-02671-CCA-R3-CD, 2014 WL 1423240, at *1 (Tenn. Crim. App. Apr. 11, 2014), perm. app. granted (Tenn. Oct. 20, 2014).

under the Confrontation Clause of the United States Constitution.  Id. at *39 (Tipton, P.J., concurring in part and dissenting in part).

## Issues Presented

The Defendant filed an application for permission to appeal to this Court.  In his application, the Defendant raised the following seven issues:

(1) Whether the Court of Criminal Appeals adequately analyzed the trial court's highly prejudicial, constitutional error in admitting the evidence of the Defendant's illegally withdrawn blood under Missouri v. McNeely?

(2) Whether the admission into evidence of the autopsy report prepared by Dr. Sandra K. Elkins violated the Defendant's constitutional right to confront the witnesses against him because of the close relationship between the medical examiner to law enforcement, as well as the conclusions and observations of the preparing medical examiner in an autopsy report?

(3) Whether the exigent circumstances that justified the initial warrantless entry of the Defendant's home and the "plain view" of the crime scene also justified the warrantless, extended, subsequent re-entry of the Defendant's home for the purpose of crime scene investigation after the responding officer had already arrived, removed the Defendant from his home, secured the crime scene, and exited the Defendant's home?

(4) Whether the Court of Criminal Appeals' application of the "inevitable discovery" doctrine effectively abolishes the warrant requirement of the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution?

(5) Whether the Court of Criminal Appeals incorrectly analyzed the destruction of evidence that was used against the Defendant?

(6) Whether the harmless error analysis for non-structural constitutional errors needs to be clarified for Tennessee courts?

(7) Whether the Court of Criminal Appeals conducted a proper analysis of the effect of the recognized "harmless" errors under the cumulative error doctrine?

This Court granted permission to appeal.  In the order granting review, the Court expressed particular interest in the following two issues:

- 10 -

(1) Whether the Court of Criminal Appeals erred in upholding the trial court's admission of an autopsy report prepared by Dr. Sandra K. Elkins during the testimony of Dr. Darinka Mileusnic-Polchan; and

(2) Whether the Court of Criminal Appeals erred in applying the inevitable discovery doctrine to the search of the Defendant's home.

Our analysis will focus on the admission into evidence of the autopsy report and the related Confrontation Clause issues, as well as the trial court's denial of the Defendant's motion to suppress the evidence seized from the Defendant's home. As explained below, however, we find it unnecessary to address the inevitable discovery doctrine in this case, because the admission of evidence admitted pursuant to that doctrine, if error, was harmless in light of other properly admitted evidence. As to the remaining issues raised by the Defendant, after careful review of the record and the arguments, we find that the decision of the Court of Criminal Appeals need not be disturbed and is affirmed.

**Analysis**

*I.      Admission of Autopsy Report into Evidence*

On appeal, the Defendant argues that the admission into evidence of the autopsy report prepared by Dr. Sandra K. Elkins violated the Defendant's constitutional right to confront the witnesses against him because the Defendant did not have the opportunity to cross-examine Dr. Elkins. The Defendant contends that the autopsy report in this case must be classified as testimonial, given the close relationship between law enforcement and the medical examiner and the fact that the Defendant was in custody as the suspected perpetrator at the time the autopsy was performed. As such, he insists, the autopsy report should have been excluded, and its admission into evidence violated his rights under the Confrontation Clause of the United States Constitution and article I, section 9 of the Tennessee Constitution.

The Court of Criminal Appeals rejected this argument. Hutchison, 2014 WL 1423240, at *28-31. It relied on the intermediate appellate court's decision in State v. Dotson, No. W2011-00815-CCA-R3-DD, 2013 WL 4728679, at *66 (Tenn. Crim. App. June 25, 2013), in which the Court of Criminal Appeals concluded that it was not error to admit into evidence an autopsy report prepared by a different medical examiner than the one who testified at trial, because the primary purpose of the autopsy report "was not to target the defendant as the perpetrator but instead to identify the injuries sustained by the victims and their causes of death." Hutchison, 2014 WL 1423240, at *30 (quoting Dotson, 2013 WL 4728679, at *66). The Court of Criminal Appeals acknowledged that, unlike Dotson, the Defendant in this case was in custody at the time of the autopsy.

Nevertheless, the majority held that the purpose of the autopsy in this case was to identify the injuries sustained by the victim, not to target an individual, so the autopsy report was not testimonial and its admission into evidence did not violate the Confrontation Clause. Id. The dissenting member of the panel disagreed with the conclusion that the autopsy report was not testimonial under the Confrontation Clause but also concluded that any such error was harmless. Id. at *39-41 (Tipton, P.J., concurring in part and dissenting in part).

Soon after Court of Criminal Appeals issued its decision in the instant case, we rendered our decision in Dotson, affirming the decision of the intermediate appellate court on which the Court of Criminal Appeals below relied. State v. Dotson, 450 S.W.3d 1 (Tenn. 2014). Our opinion in Dotson included an extensive review of recent jurisprudence on the Confrontation Clause in a similar context. See id. at 62-70. In Dotson, however, the defendant failed to object to the admission of the autopsy reports in question, so this Court limited its analysis to a plain-error review. Id. at 70. As a consequence, after setting forth a detailed analytical framework, the Dotson Court held only that no clear rule of law was breached by the admission into evidence of the autopsy reports; the Court did not decide whether the autopsy reports were testimonial or whether a medical examiner may testify about an autopsy report produced by another medical examiner who does not testify at trial. Id. at 72. In the instant case, those issues are squarely presented, so we will address them in accordance with the analytical framework outlined in Dotson.

*A.*

The Confrontation Clause of the Sixth Amendment to the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."[4] U.S. Const. amend. VI. Article I, section 9 of the Tennessee Constitution contains a similar provision; it states "[t]hat in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face." Tenn. Const. art. I, § 9. This Court has held that this provision of the Tennessee Constitution imposes no restrictions on admitting hearsay statements beyond those of the federal constitution as interpreted in Crawford v. Washington, 541 U.S. 36 (2004), and its progeny. See State v. McCoy, 459 S.W.3d 1, 13-14 (Tenn. 2014). In deciding issues under the Confrontation Clause in the Tennessee Constitution, we apply the same analysis used to evaluate claims based on the Confrontation Clause of the Sixth Amendment to the United States Constitution. Thus, the Dotson Court explained, we "unitarily analyze the [D]efendant's federal and state constitutional claims, as the same standards govern both." Dotson, 450 S.W.3d at 62 (citing State v. Parker, 350 S.W.3d 883, 898 (Tenn. 2011); State v. Franklin, 308 S.W.3d 799, 809-10 (Tenn. 2010); State v.

---

[4] The Confrontation Clause is made applicable to the States via the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403 (1965).

Cannon, 254 S.W.3d 287, 301 (Tenn. 2008); State v. Lewis, 235 S.W.3d 136, 145 (Tenn. 2007)).

*B.*

As noted in Dotson, "the threshold question in every case where the Confrontation Clause is relied upon as a bar to the admission of an out-of-court statement is whether the challenged statement is testimonial." Dotson, 450 S.W.3d at 63 (citing State v. Cannon, 254 S.W.3d 287, 301 (Tenn. 2008)); see also Crawford, 541 U.S. at 51-52. In Crawford, the United States Supreme Court observed, "The text of the Confrontation Clause . . . applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'" Crawford, 541 U.S. at 51 (citing 2 N. Webster, An American Dictionary of the English Language (1828)). In turn, "[t]estimony . . . is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" Id. (alteration in original) (quoting N. Webster, An American Dictionary of the English Language (1828)). Thus, the Confrontation Clause applies only to "testimonial statements" and is not implicated where the evidence in question is nontestimonial hearsay. Davis v. Washington, 547 U.S. 813, 823-24 (2006); see Dotson, 450 S.W.3d at 63.

In Crawford, the U.S. Supreme Court declined to define the term "testimonial" in the context of the Confrontation Clause, but instead it gave examples of statements that would be deemed testimonial:

> Various formulations of this core class of "testimonial" statements exist: "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition—for example, *ex parte* testimony at a preliminary hearing.

Crawford, 541 U.S. at 51-52 (citations omitted); see also Dotson, 450 S.W.3d at 63-64.

- 13 -

In 2006, two years after <u>Crawford</u>, the U.S. Supreme Court in <u>Davis v. Washington</u> further addressed the difference between testimonial evidence and nontestimonial evidence. <u>Davis</u>, 547 U.S. at 822. The two can be distinguished, <u>Davis</u> explained, by looking at the "primary purpose" of the statement:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

<u>Id</u>. Citing this language, the <u>Dotson</u> Court observed, "in <u>Davis</u>, the Supreme Court instructed that the 'primary purpose' of a statement marks the relevant dividing line" between testimonial and nontestimonial hearsay under the Confrontation Clause, with focus on whether the primary purpose of the statement was to meet an ongoing emergency or prove past events pertinent to a criminal prosecution. <u>Dotson</u>, 450 S.W.3d at 64 (citing <u>Davis</u>, 547 U.S. at 822).

*C.*

The primary purpose test was applied in <u>Melendez-Diaz v. Massachusetts</u> to determine whether the challenged evidence was testimonial for purposes of the Confrontation Clause. <u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305 (2009). In that case, the defendant objected to the admission into evidence of "certificates of analysis" that described the results of forensic testing and identified cocaine as the substance that had been in the possession of the defendant at the time of his arrest. <u>Id.</u> at 308-09. The certificates contained the notarized signature of the analyst who performed the forensic testing, but that analyst did not testify at the defendant's criminal trial. <u>Id.</u> The Court characterized the certificates as "quite plainly affidavits" that fell within the "core class of testimonial statements" described in <u>Crawford</u>. <u>Id.</u> at 310. As to the purpose of the notarized certificates, the Court said that each was a "solemn declaration or affirmation made for the purpose of establishing or proving some fact" and providing "prima facie evidence of the composition, quality, and the net weight of the analyzed substance." <u>Id.</u> at 310, 311 (citations omitted). The Court concluded: "Absent a showing that the analysts were unavailable to testify at trial and that [the defendant] had a prior opportunity to cross-examine them, [the defendant] was entitled to 'be confronted with' the analysts at trial." <u>Id. at 311 (quoting Crawford, 541 U.S. at 54)</u>; see <u>Ohio v. Clark</u>, 135 S. Ct. 2173, 2180 (2015) (second alteration in original) (quoting <u>Michigan v. Bryant</u>, 562 U.S. 344, 358 (2011)) ("In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the [out-of-court statement] was to 'creat[e] an out-of-court substitute for trial testimony.'").

The difference between testimonial evidence and nontestimonial evidence was further explored in Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011). In that case, the prosecution relied on a forensic laboratory report that certified the level of the defendant's blood-alcohol concentration, introduced into evidence as a business record. Id. at 2712. Instead of introducing the report into evidence through the testimony of the analyst who performed the testing, the prosecution called as a witness "another analyst who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on Bullcoming's blood sample." Id. at 2709. The defendant objected, but the trial court allowed the report to be admitted as a business record. Id. at 2712. The New Mexico Court of Appeals affirmed the conviction, holding that the report was nontestimonial. State v. Bullcoming, 189 P.3d 679, 685 (N.M. Ct. App. 2008). The Supreme Court of New Mexico affirmed, State v. Bullcoming, 226 P.3d 1, 8-9 (N.M. 2010), and the defendant appealed to the U.S. Supreme Court.

Bullcoming resulted in a four-member plurality opinion reversing the Court of Appeals, with the fifth vote supplied by Justice Sotomayor in a separate concurrence. Bullcoming, 131 S.Ct. at 2719. The four-member plurality first looked at the purpose of the forensic laboratory report. It found that, as with the certificates in Melendez-Diaz, the report at issue was "'made for the purpose of establishing or proving some fact' in a criminal proceeding." Bullcoming, 131 S. Ct. at 2716 (quoting Melendez-Diaz, 129 S. Ct. at 2532). "A document created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation, ranks as testimonial." Id. at 2717 (citing Melendez-Diaz, 129 S. Ct. at 2532). It then commented on the "formalities" of the document, observing that "the formalities attending the 'report of blood alcohol analysis' [were] more than adequate to qualify [the certifying analyst's] assertions as testimonial." Id. In her separate concurrence, Justice Sotomayor agreed with the plurality that the report was testimonial. Justice Sotomayor wrote separately in part to emphasize that she concluded that the report was testimonial because "its 'primary purpose' is evidentiary." Id. at 2719 (Sotomayor, J., concurring).

Any hopes of a single standard on when an out-of-court statement is considered testimonial were dispelled in Williams v. Illinois, 132 S. Ct. 2221 (2012). In Williams, a case involving sexual assault, robbery, and kidnapping, the prosecution had relied on a DNA profile prepared by an outside laboratory, Cellmark, using vaginal swabs from the crime victim's rape kit. Id. at 2227. A police DNA analyst took the Cellmark DNA and searched the state's DNA database for a match. Id. at 2229. The police DNA analyst testified that the defendant's DNA profile in the state database, taken in connection with an earlier arrest, matched the male DNA profile Cellmark had developed from the victim's vaginal swabs. Id. at 2230. However, the Cellmark report on which the police DNA analyst based her testimony was not introduced in evidence. Id. at 2231. The appeal to the U.S. Supreme Court regarding the admissibility of the Cellmark report resulted in another splintered opinion: a four-Justice plurality opinion authored by

Justice Alito and joined by Chief Justice Roberts and Justices Kennedy and Breyer; a separate concurring opinion authored by Justice Thomas; and a four-Justice dissent authored by Justice Kagan and joined by Justices Scalia, Ginsburg, and Sotomayor.

After reviewing the Court's prior cases on the Confrontation Clause, Justice Alito's plurality opinion in Williams asserted:  "The abuses that . . . prompt[ed] the adoption of the Confrontation Clause . . . (a) . . . involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) . . . involved formalized statements such as affidavits, depositions, prior testimony, or confessions."  Id. at 2242.  The plurality observed that, in virtually every post-Crawford case in which a violation of the confrontation right was found, "the statement at issue had the primary purpose of accusing a targeted individual."  Id.  As in earlier cases, the plurality utilized a primary purpose test described as "an objective test" in which the court looks at "the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances."  Id. at 2243 (citing Bryant, 131 S. Ct. at 1156).  However, the primary purpose test was refined by the plurality to focus on whether the out-of-court statement had "the primary purpose of accusing a targeted individual."  Id.  Applying that test, the plurality concluded that the Cellmark DNA profile was not testimonial for purposes of the Confrontation Clause:

> [T]he primary purpose of the Cellmark report, viewed objectively, was not to accuse petitioner or to create evidence for use at trial.  When the ISP lab sent the sample to Cellmark, its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time.  Similarly, no one at Cellmark could have possibly known that the profile that it produced would turn out to inculpate petitioner—or for that matter, anyone else whose DNA profile was in a law enforcement database.  Under these circumstances, there was no "prospect of fabrication" and no incentive to produce anything other than a scientifically sound and reliable profile.

Id. at 2243-44 (citing Bryant, 131 S. Ct. at 1157).  The Williams plurality also noted that, because of the complexity of DNA testing, "defects in a DNA profile may often be detected from the profile itself."  Id. at 2244.  Where there is no indication that the lab had been provided the petitioner's DNA profile, the plurality reasoned, any chance of inadvertently identifying the petitioner is "beyond fanciful."  Id.  On this basis, Justice Alito's plurality opinion concluded that the primary purpose of the DNA profile was not to accuse a targeted individual, so the evidence was not "testimonial" under the Confrontation Clause.  Id.

Justice Thomas filed a separate concurrence in which he also concluded that the DNA profile was not testimonial, so he supplied the fifth vote for the majority. Id. at 2255. (Thomas, J., concurring). He based his conclusion, however, on reasoning that differed significantly from that of Justice Alito's plurality. Justice Thomas agreed with the past formulation of the primary purpose test, that is, for a statement to be testimonial, the court must find that a reasonable person would conclude that the declarant primarily intended for the statement to establish a fact and that the declarant understood that his statement might be used in a criminal prosecution. Id. at 2261. Justice Thomas described this as a "necessary criterion" but viewed it as not "sufficient" in and of itself. Id. To be testimonial, Justice Thomas asserted, the statement must also possess sufficient "indicia of solemnity." Id. at 2259 (quoting Davis, 547 U.S. at 836-37). Justice Thomas explained that only "'formalized testimonial materials,' such as depositions, affidavits, and prior testimony, or statements resulting from 'formalized dialogue,' such as custodial interrogation," would satisfy this additional criterion. Id. at 2260 (internal quotation marks omitted). Justice Thomas concluded that the DNA profile in Williams was not testimonial because it was "neither a sworn nor a certified declaration of fact" and "was not the product of any sort of formalized dialogue resembling custodial interrogation." Id. Justice Thomas rejected the plurality's targeted-accusation requirement, noting that a statement that does not appear inculpatory on its face may later "turn out to be highly probative of a defendant's guilt when considered with other evidence." Id. at 2263.

Justice Kagan's dissent, filed with the concurrence of the three other dissenting Justices, embraced a rationale different from the approaches taken by either Justice Alito's plurality opinion or Justice Thomas's separate concurrence. Id. at 2264 (Kagan, J., dissenting). The dissent rejected the plurality's targeted-accusation test, noting among other things that the typical cross-examination of laboratory personnel attacks "careless or incompetent work" rather than actions to accuse a particular person of the crime. Id. at 2274. It derided the plurality's suggestion that, because the DNA profile was done "to catch a dangerous rapist who was still at large," it could be considered a response to an ongoing emergency, analogous to the statements deemed not testimonial in Davis and Bryant. Id. The dissent also rejected Justice Thomas's emphasis on formalities, criticizing his analysis as granting "constitutional significance to minutia." Id. at 2276. The dissent concluded that the DNA profile was testimonial because it was done to establish a fact in a criminal proceeding, namely, the identity of the rapist. Id. at 2266 (citing Bullcoming, 131 S. Ct. at 2716). Therefore, the dissent would have concluded that allowing an expert to testify who had no knowledge of the DNA profile violated Williams' Sixth Amendment right to confront the witnesses against him. Id. at 2268.

*D.*

In Dotson, this Court highlighted the difficulty of applying Williams, a U.S. Supreme Court decision that includes several widely varying standards: "The Supreme Court's fractured decision in Williams provides little guidance and is of uncertain

- 17 -

precedential value because no rationale for the decision—not one of the three proffered tests for determining whether an extrajudicial statement is testimonial—garnered the support of a majority of the Court." Dotson, 450 S.W.3d at 68 (citations omitted). The Dotson Court found the traditional method of synthesizing the various approaches to be of little use in applying Williams. Dotson, 450 S.W.3d at 65-69 (noting that Justice Alito's plurality opinion and Justice Thomas's separate concurrence in Williams "share no common denominator"). But Dotson cited favorably the approach to Williams employed by a District of Columbia court:

> [I]t can be argued that while [the plurality's] rationale and Justice Thomas's rationale may not be includible within each other, the different tests they utilize to determine whether a statement is testimonial are subsumed within and narrower than the dissenters' test. That is so because [the plurality] and Justice Thomas each added an additional requirement to the basic "evidentiary purpose" test espoused by [the dissenters]. If the four-Justice plurality would deem a statement testimonial under the targeted accusation test, the four dissenting Justices surely would deem it testimonial under the broader evidentiary purpose test. Similarly, if Justice Thomas would deem a statement testimonial employing his formality criterion along with the evidentiary purpose test, the four dissenting Justices necessarily would deem it testimonial using the evidentiary purpose test alone. *It therefore is logically coherent and faithful to the Justices' expressed views to understand Williams as establishing—at a minimum—a sufficient, if not a necessary, criterion: a statement is testimonial at least when it passes the basic evidentiary purpose test plus either the plurality's targeted accusation requirement or Justice Thomas's formality criterion.* Otherwise put, if Williams does have precedential value . . . an out-of-court statement is testimonial under that precedent if its primary purpose is evidentiary and it is either a targeted accusation or sufficiently formal in character.

Dotson, 450 S.W.3d at 69-70 (alterations in original) (emphasis added) (quoting Young v. United States, 63 A.3d 1033, 1043-44 (D.C. 2013)). Thus, while Dotson recognized the difficulties associated with a splintered opinion such as Williams, the Court provided a framework for applying the varying Williams standards.[5]

---

[5] Some states have simply deemed Williams unusable as precedent and have chosen to revert to pre-Williams standards. See, e.g., State v. Michaels, 95 A.3d 648, 666 (N.J. 2014), *cert. denied*, Michaels v. New Jersey, 135 S. Ct. 761 (2014) ("We find Williams's force, as precedent, at best unclear. Without more definitive evidence that the Court is adopting an approach other than the primary purpose test for use in determining when a forensic document is testimonial, we are reluctant to conclude that the primary purpose test has been abandoned."). We disagree with this approach and decline to ignore Williams simply because it is difficult to apply.

Utilizing that framework in this case, we will look first to whether the autopsy report satisfies the broad standard advocated by the four dissenting Justices in Williams, under which a statement would be deemed testimonial if its primary purpose is to prove past events potentially relevant to a criminal prosecution. Once past that threshold, we will consider whether: (1) the autopsy report has "indicia of solemnity" as set forth in Justice Thomas's separate concurrence in Williams *or* (2) the primary purpose of the autopsy report was to accuse a targeted individual, in accordance with Justice Alito's plurality in Williams. See Williams, 132 S. Ct at 2243, 2259-60; Davis, 547 U.S. at 822; Dotson, 450 S.W.3d at 67-68; see also Young, 63 A.3d at 1043-44. If the autopsy report meets the threshold standard and either of the latter two standards, it is considered testimonial within the meaning of the Confrontation Clause.

*E.*

As the Defendant points out, there are significant differences between the facts in Williams and the circumstances of this case. In Williams, the DNA profile at issue was done before law enforcement arrested the defendant; DNA in a database matched DNA taken from vaginal swabs of the victim and was eventually linked to the defendant. Williams, 132 S. Ct. at 2229. Justice Alito's plurality took the position that the DNA profile was "not to obtain evidence for use against [the defendant]" since the defendant "was neither in custody nor under suspicion at that time." Id. at 2243. Rather, the DNA testing in Williams was done in order to apprehend "a dangerous rapist who was still at large." Id. at 2225.

In contrast, the Defendant in this case was arrested at the time the crime was discovered, so he was already in custody when Dr. Elkins performed the autopsy of the victim. The autopsy was not done in order to "bring an end to an ongoing threat." Id. (citing Bryant, 131 S. Ct. at 1157). When officers came upon the victim's body, it was "patently obvious that [he] had been the victim of foul play." State v. Freeman, No. M2011-00184-CCA-R3-CD, 2012 WL 1656975, at *13 (Tenn. Crim. App. May 9, 2012) (decided prior to Williams, applying primary purpose test). KPD personnel were present at the autopsy, photographed the body during the autopsy, and brought to the autopsy items possibly used to kill the victim. These facts also would have indicated to the medical examiner that the autopsy would likely be used in a criminal prosecution. See United States v. Moore, 651 F.3d 30, 73 (D.C. Cir. 2011) (deeming autopsies to be testimonial in part based on fact that law enforcement officers observed autopsies and participated in creation of autopsy reports); Lee v. State, 418 S.W.3d 892, 896 (Tex. Ct. App. 2013) (when law enforcement officer was present at autopsy, "an objective medical examiner would reasonably believe that her report would be used in a later prosecution"); Martinez v. State, 311 S.W.3d 104, 111 (Tex. Crim. App. 2010) (where police officer attended autopsy and photographed the body, it would have been reasonable for medical examiner "to have assumed that his autopsy report would be used prosecutorially").

We recognize that "an autopsy may be conducted and a report generated for purposes other than its use at a later criminal trial . . . ."[6] Freeman, 2012 WL 1656975, at *13. In this case, however, the circumstances objectively indicate that the autopsy report was "meant to serve as evidence in a potential criminal trial." Williams, 132 S. Ct. at 2275 (Kagan, J., dissenting). Thus, the autopsy report meets the standard urged by the four Justices in the Williams dissent.

*F.*

As outlined in Dotson, since the autopsy report in this case meets the broad threshold standard advocated by the four dissenting Justices in Williams, we go on to determine whether it meets the narrower criteria used by either Justice Thomas in his Williams concurrence or by Justice Alito in the Williams plurality opinion.

First we consider the autopsy report under the standard advocated by Justice Thomas. In his separate concurrence, Justice Thomas asserted that the Confrontation Clause "reaches 'formalized testimonial materials,' such as depositions, affidavits, and prior testimony, or statements resulting from 'formalized dialogue,' such as custodial interrogation." Williams, 132 S. Ct. at 2260 (Thomas, J., concurring) (internal quotation marks omitted). He looked for "indicia of solemnity" such as a sworn or certified declaration of fact as would be contained in an affidavit or deposition. Id. at 2259-60. He also looked at whether the statement came from a formal process resembling custodial questioning. Id. at 2260-61.

The autopsy report in question in this case shows that it was "authorized by" Dr. Elkins, and it contains her electronic signature. However, Dr. Elkins neither swears to nor certifies the facts or findings contained in the report. Overall, the autopsy report lacks the formality and solemnity of an affidavit, deposition, or prior testimony, as described by Justice Thomas in his Williams concurrence. Certainly the autopsy report did not result from a formal dialogue such as a custodial interrogation. See People v. Leach, 980 N.E.2d 570, 592 (Ill. 2012) (contrasting autopsy report with the forensic report described in Melendez-Diaz, concluding that autopsy report was merely signed by

---

[6] We note that a Tennessee statute provides that "[t]he records of the division of post mortem examination, the county medical examiner, or transcripts of the records certified to by the chief medical examiner . . . or the duly appointed representative of the chief medical examiner . . . shall be received as competent evidence in any court of this state of the facts and matters contained in the records or reports." Tenn. Code Ann. § 38-7-110(a) (2014). At least one sister state with a similar statute has held that, "for purposes of use in criminal prosecutions, autopsy reports are under all circumstances testimonial." State v. Kennedy, 735 S.E.2d 905, 917 (W. Va. 2012). We disagree with this reasoning. As noted above, not all autopsies are done for the purpose of establishing a fact for eventual criminal prosecution. Rather than simply relying on a statute that addresses the use of an autopsy report in court, we look at the totality of the circumstances concerning the primary purpose of the autopsy report.

medical examiner and was not certified or sworn, so it would not be considered testimonial by Justice Thomas). But see Rosario v. State, 175 So. 3d 843, 858 (Fla. Dist. Ct. App. 2015) ("[N]ot only does the [autopsy] report satisfy the primary purpose test, it is also sufficiently solemn."). Therefore, we conclude that the autopsy report does not meet the criteria set out in Justice Thomas's Williams concurrence.

Under Dotson, we go on to determine if the autopsy report meets the standard described by Justice Alito's plurality in Williams. As noted above, the plurality held that an out-of-court statement is deemed testimonial under the Confrontation Clause if its primary purpose is "accusing a targeted individual." Williams, 132 S. Ct. at 2243.

As we have observed, in Williams, the defendant had not yet been apprehended when the DNA profile at issue was done, and this fact was emphasized by the plurality in holding that the primary purpose of the DNA profile was not to accuse a targeted person. Id. This case differs in that the Defendant was in custody at the time of the autopsy. Looking at this prong of the Williams analysis, the majority of the Court of Criminal Appeals below held nevertheless that the primary purpose of the autopsy "was to identify the injuries sustained by the victim and determine his cause of death," not to accuse the Defendant. Hutchison, 2014 WL 1423240, at *30. The majority commented that "the autopsy report would have remained the same whether or not the police had [the Defendant] or any other suspect in custody." Id. It concluded therefore that the autopsy report was not testimonial and its admission into evidence did not violate the Confrontation Clause. The dissent in the Court of Criminal Appeals stated that, in light of the fact that the victim's death "was a homicide, and the Defendant was the identified suspect before the autopsy commenced," the dissent would conclude that the autopsy "was conducted with the primary purpose of being used in a criminal trial and used as evidence against the Defendant, thereby implicating the Confrontation Clause." Id. at *41.

In the trial court below, Dr. Mileusnic-Polchan testified that the general role of a medical examiner performing an autopsy is to "determine the cause and manner of death, and then confirm the mechanism of death and then essentially compare our findings to the scene investigation," and then leave it to law enforcement to determine who committed the crime. The autopsy report in this case came to the rather unsurprising conclusion that the victim's death was caused by "blunt force head injuries" and "stab wounds to the chest." However, in any case, until the autopsy is performed, law enforcement cannot know with certainty the cause or manner of death. Leach, 980 N.E.2d at 591-92 (noting that the cause of death determined by medical examiner could have "either incriminated or exonerated [the suspect], depending on what the body revealed about the cause of death"). Furthermore, the autopsy report by Dr. Elkins does not reference evidence linking the Defendant to the blunt force trauma listed as the cause of death. State v. Norton, 117 A.3d 1055, 1073 (Md. 2015) ("The forensic document, to be testimonial pursuant to the Williams plurality, must contain a conclusion that connects

- 21 -

the defendant to the underlying crime.") (citations omitted); see also People v. Negron, 984 N.E.2d 491, 503 (Ill. App. Ct. 2012) ("Nothing in the report directly linked defendant to the crime. Unlike a DNA test which might identify a defendant as the perpetrator of a particular crime, the autopsy finding of homicide did not directly accuse defendant.").

In People v. Leach, the Illinois Supreme Court applied the standard of the Williams plurality to an autopsy report. People v. Leach, 980 N.E.2d 570, 580 (Ill. 2012). The autopsy was done by a medical examiner who retired prior to the murder trial of the victim's husband; the report was admitted into evidence through the testimony of a deputy medical examiner who did not participate in the autopsy but testified at trial as an expert. Id. at 575. In that case, the defendant admitted that he choked the victim but said that her death was an accident; he was an identified suspect at the time the autopsy was performed. Id. at 574. The Leach Court said that the medical examiner was "not acting as an agent of law enforcement, but as one charged with protecting the public health by determining the cause of a sudden death that might have been 'suicidal, homicidal or accidental.'" Id. at 591-92 (citing Illinois statute on duties of medical examiner). Although an autopsy may be used in a later criminal prosecution, the Court observed:

> [T]he primary purpose of preparing an autopsy report is not to accuse 'a targeted individual of engaging in criminal conduct' or to provide evidence in a criminal trial. An autopsy report is prepared in the normal course of operation of the medical examiner's office, to determine the cause and manner of death, which, if determined to be homicide, could result in charges being brought.

Id. at 592. (internal citations to Williams, 132 S. Ct. at 2242; and Davis, 547 U.S. at 822, omitted from quote). The Court concluded that the autopsy in that case "sought to determine how the victim died, not who was responsible." Leach, 980 N.E.2d at 592. It held, therefore, that its admission into evidence did not contravene the Confrontation Clause.

The dissent in the Court of Criminal Appeals below would have held that the autopsy report in this case was testimonial under the Confrontation Clause because "[t]he victim's death was a homicide, and the Defendant was the identified suspect before the autopsy commenced." Hutchison, 2014 WL 1423240, at *4. This analysis is more consistent with the standard advocated by the dissent in Williams than the standard employed by the plurality. We agree with the observation of the Illinois Supreme Court in Leach that "an autopsy report prepared in the normal course of business of a medical examiner's office is not rendered testimonial merely because the . . . medical examiner performing the autopsy is aware that police suspect homicide and that a specific individual might be responsible." Leach, 980 N.E.2d at 593. The overall circumstances do not indicate that the autopsy report in this case was "made for the purpose of proving the guilt of a particular criminal defendant at trial." Williams, 132 S. Ct. at 2243.

- 22 -

Thus, while the autopsy report prepared by Dr. Elkins meets the broad standard advocated by the dissent in Williams, it meets neither the standard under Justice Thomas's concurrence nor the standard of the Williams plurality. We hold, therefore, that the autopsy report is not testimonial under Williams and its admission into evidence at trial did not violate the Defendant's rights under the Confrontation Clause.

*G.*

In connection with his argument under the Confrontation Clause, the Defendant contends that Dr. Mileusnic-Polchan's testimony violated his right of confrontation because she did not perform the autopsy, yet she relied on an inadmissible autopsy report in her testimony. This argument falls by the wayside in the wake of our conclusion that the admission into evidence of the autopsy report did not violate the Defendant's rights under the Confrontation Clause. We agree with the analysis of the Court of Criminal Appeals on this issue, and we also note the following excerpt from Justice Alito's Williams plurality opinion:

> When an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.

Williams, 132 S. Ct. at 2228; see also United States v. Johnson, 587 F.3d 625, 635-36 (4th Cir. 2009) (even if statements relied upon by experts were testimonial, there was no Confrontation Clause violation because the "expert witnesses present[ed] their own independent judgments, rather than merely transmitting testimonial hearsay, and [were] subject to cross-examination"). As one court has explained, "[W]e agree with the proposition that the Confrontation Clause is not violated when an expert testifies regarding his or her independent judgment, even if that judgment is based upon inadmissible testimonial hearsay." State v. McLeod, 66 A.3d 1221, 1230 (N.H. 2013); see also United States v. Ramos–González, 664 F.3d 1, 5 (1st Cir. 2011) ("Where an expert witness employs her training and experience to forge an independent conclusion, albeit on the basis of inadmissible evidence, the likelihood of a Sixth Amendment infraction is minimal."); United States v. Williams, 740 F. Supp. 2d 4, 9-10 (D.D.C. 2010) (an expert may testify as to independent judgment reached by application of expert's training and experience to testimonial evidence); State v. Gonzales, 274 P.3d 151, 159 (N.M. 2012) ("An expert's testimony may be based on inadmissible evidence, and until such expert testimony crosses the line from the formation of an independent opinion based on underlying raw data to a reliance on the conclusions and opinions of the author of the autopsy or a mere parroting of the report's findings, then that testimony is

admissible subject to the rules of evidence."); State v. Manion, 295 P.3d 270, 278 (Wash. Ct. App. 2013) (testifying expert may base his opinion on nontestifying expert's testimonial statement, so long as testifying expert exercised independent judgment). Under the circumstances presented, we hold that Dr. Mileusnic-Polchan's expert testimony did not violate the Defendant's rights under the Confrontation Clause.

## II. *Warrantless Seizure of Evidence from Defendant's Home*

We turn now to the Defendant's contention that officers' warrantless search of his home constituted an unreasonable search and seizure and violated his rights under the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution. The Defendant argues that, even if Officer Shaffer's initial entry into his home was justified due to exigent circumstances, the later entries by officers and crime scene technicians without a search warrant exceeded the scope of any exigent circumstances and that the evidence seized should have been suppressed. In the alternative, the Defendant argues, even if the items in plain view were lawfully admitted into evidence, several items seized during the warrantless search of his home were not in plain view, specifically the knife handle, the navy blue sweatshirt, and the gold nugget ring found in the bathroom.

The Court of Criminal Appeals held that Officer Shaffer's entry into the home without a warrant was justified by exigent circumstances and that the entry of the officers and technicians who arrived after Officer Shaffer was a continuation of his original entry, citing State v. Coulter, 67 S.W.3d 3 (Tenn. Crim. App. 2001). Hutchison, 2014 WL 1423240, at *16-17. As to the evidence that the Defendant alleges was not in plain view, the Court of Criminal Appeals applied the inevitable discovery doctrine to hold that its admission into evidence was harmless beyond a reasonable doubt. Id. at *18.

### A.

The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure . . . against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Article I, section 7 of the Tennessee Constitution also proscribes unreasonable searches and seizures; it is identical in intent and purpose to the Fourth Amendment to the federal Constitution. State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) (citing Sneed v. State, 221 Tenn. 6, 423 S.W.2d 857, 860 (1968)). "Consequently, under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Id. (quoting State v. Yeargan, 958 S.W.2d 626, 629 (Tenn.1997)); see also Thompson v. Louisiana, 469 U.S. 17, 20 (1984); Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971).

The exceptions to the requirement of obtaining a valid search warrant include search incident to a lawful arrest, consent to search, plain view, stop and frisk, and search under exigent circumstances. State v. Cox, 171 S.W.3d 174, 179 (Tenn. 2005) (citing State v. Bartram, 925 S.W.2d 227, 230 & n.2 (Tenn. 1996)). "If the circumstances of a challenged search and seizure come within one of the recognized exceptions, the fruits of that search and seizure are not subject to operation of the exclusionary rule and may be properly admitted into evidence." State v. Shaw, 603 S.W.2d 741, 743 (Tenn. Crim. App. 1980).

At a hearing on a motion to suppress evidence recovered as a result of a warrantless search, the State must prove that law enforcement conducted the warrantless search or seizure pursuant to one of the exceptions to the warrant requirement. Binette, 33 S.W.3d at 218. The trial court's findings of fact at a hearing on a motion to suppress are binding upon the appellate court unless the evidence contained in the record preponderates against them. State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001).

*B.*

As it did in the lower courts, the State contends in this case that the warrantless entry into the Defendant's home and the ensuing search were justified by "exigent circumstances." The Supreme Court has held that, at times, "the exigencies of the situation [may] make the needs of law enforcement so compelling that the warrantless search is objectively reasonable." Mincey v. Arizona, 437 U.S. 385, 393-394 (1978), quoted in Michigan v. Fisher, 558 U.S. 45, 47 (2009); see Brigham City v. Stuart, 547 U.S. 398, 399 (2006). "Exigent circumstances are those in which the urgent need for immediate action becomes too compelling to impose upon governmental actors the attendant delay that accompanies obtaining a warrant." State v. Meeks, 262 S.W.3d 710, 723 (Tenn. 2008). Although this list is not exhaustive, we have held that exigent circumstances justifying a warrantless search may exist: (1) when officers are in hot pursuit of a suspect, (2) when immediate police action is needed to thwart the escape of a suspect, (3) when immediate police action is necessary to prevent the destruction of evidence, (4) when the suspect presents an immediate threat to police officers or others, and (5) to render emergency aid to an injured person or to protect a person from imminent injury. Id. (citing Brigham City, 547 U.S. at 403); see State v. Adams, 238 S.W.3d 313, 321 (Tenn. Crim. App. 2005) (quoting State v. Givens, No. M2001-00021-CCA-R3-CD, 2001 WL 1517033 (Tenn. Crim. App. Nov. 29, 2001)).

The exigency of the circumstances is assessed objectively, based on the totality of the circumstances at the time of the warrantless entry. Meeks, 262 S.W.3d at 723. "The manner and the scope of the search must be reasonably attuned to the exigent circumstances that justified the warrantless search, or the search will exceed the bounds authorized by exigency alone." Id. at 724.

Clearly, Officer Shaffer's initial entry into the Defendant's home was justified by exigent circumstances. Upon his arrival at the home in response to a call, Officer Shaffer was met by three extremely agitated men who yelled repeatedly, "He's inside! He's inside!" When backup officers arrived a few minutes later, Officer Shaffer entered the home and found the Defendant, obviously injured. The same three men followed him in and urged him to go upstairs, where he found the victim.

The Defendant does not seriously question that exigent circumstances supported Officer Shaffer's entry into the home and his entry into the upstairs bedroom in which the victim was located. Instead, the Defendant argues that there was no justification for the ensuing search by other officers and especially crime scene technicians who immediately began processing evidence in the home. The Defendant notes that the U.S. Supreme Court has expressly declined to adopt a "murder scene exception" to the warrant requirement. See Mincey, 437 U.S. at 395; see also Flippo v. West Virginia, 528 U.S. 11, 14. The Defendant argues that officers could easily have secured the home and gotten a search warrant before commencing with the search and the processing of the evidence in the home, but simply chose not to do so.

Our Court of Criminal Appeals considered a similar situation in State v. Coulter, 67 S.W.3d 3 (Tenn. Crim. App. 2001). In Coulter, the defendant was convicted of the murder of his wife. Coulter, 67 S.W.3d at 25. The night of the murder, the defendant walked into the local police station and informed the attendant officer that he had just killed his wife. Id. at 16. He was promptly handcuffed and escorted to a patrol car; an officer drove the defendant to the couple's home where the wife's body was discovered on a bed. Id. A second officer dispatched to the home collected evidence, including the murder weapon in the kitchen and bed linens. Id. at 16-17. Upon the removal of the wife's body from the bed, officers found a bullet hole in the mattress and a spent bullet in the box springs. Id. at 17. The defendant challenged the evidence seized in the warrantless search of the home, especially the bullet in the box springs of the mattress on which the wife's body was found. Id. at 39-40.

On appeal, the defendant in Coulter essentially conceded that the police officer's initial entry into the defendant's home was justified by exigent circumstances. Id. at 42. The intermediate appellate court held that the collection of the murder weapon and the bed linens was justified under the plain view doctrine, and that the responding officers were also permitted to photograph the scene pursuant to the plain view doctrine. Id. at 43. The Coulter court cited with approval cases from other jurisdictions holding that the later-arriving officers' entry into the Defendant's home was a "mere continuation of the original entry" and so did not contravene the Fourth Amendment. Id. at 44 (quoting State v. Magnano, 528 A.2d 760, 764 (Conn. 1987)). It also cited with approval an opinion by the North Carolina Supreme Court holding that, when a police officer enters a private home in response to a call for help, encounters a crime scene, and then secures the crime

scene, "all property within the crime scene in plain view which the officer has probable cause to associate with criminal activity is thereby lawfully seized within the meaning of the fourth amendment," so the property in plain view can be examined and seized without a search warrant. Id. at 44-45 (quoting State v. Jolley, 321 S.E.2d 883, 886 (N.C. 1984)). Based on these cases, the Court of Criminal Appeals in Coulter held that the evidence, including the spent bullet, seized by officers other than the officer who initially entered the home, did not violate constitutional mandates. Id. at 45.

In this case, the Court of Criminal Appeals relied heavily on Coulter and held that "the entry of officers arriving subsequent to Officer Shaffer was a continuation of his original entry." Hutchison, 2014 WL 1423240, at *16-17. It noted: "[A]ll of the officers, detectives, and crime scene technicians were essentially responding at the same time. Officer Shaffer only arrived as quickly as he did because he was already in the area." Id. at *17. The majority of the evidence, the Court of Criminal Appeals held, was in plain view, and its admission into evidence did not violate the Fourth Amendment. Id.

Courts in other jurisdictions have held in accord. In State v. O'Donnell, New Jersey's intermediate appellate court considered "whether evidence observed in plain view during a police entry into a residence to provide emergency aid may be seized without a warrant even though there is a short delay between the emergency aid entry and the seizure of evidence by other police officers responsible for processing the crime scene." State v. O'Donnell, 974 A.2d 420, 421 (N.J. App. Div. 2009), *aff'd*, 1 A.3d 604 (2010). In that case, police responded to a call about an unconscious child. They arrived to find the child dead and the mother sitting on a couch with blood on her hands, rambling incoherently. Id. Several officers had responded to the initial call; some took the mother into custody and others remained to secure the home. Id. at 422. About forty minutes later, before the child's body had been removed, investigators arrived and seized evidence, including various medications lying about in the home. Id. After the trial judge refused to suppress the evidence seized at the home, the defendant mother pled guilty and reserved for appeal the question of the admissibility of the evidence seized after officers responded to the initial call. Id. at 423.

Considering the issue, the New Jersey court in O'Donnell first noted the U.S. Supreme Court's decision in Michigan v. Tyler, 436 U.S. 499 (1978), in which firefighters put out a fire during the night and then returned four hours later, when it became light, to complete their investigation. O'Donnell, 974 A.2d at 424. O'Donnell observed that the Tyler Court held that the evidence seized by fire investigators in the morning investigation was not seized in violation of the defendant's constitutional rights, explaining that "the morning entries were no more than an actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of evidence." O'Donnell, 974 A.2d at 424 (quoting Tyler, 436 U.S. at 511).

The O'Donnell court then discussed the Supreme Court's decision in Mincey v. Arizona, 437 U.S. 385 (1978). O'Donnell, 974 A.2d at 424-25. In Mincey, a police officer was killed while trying to arrest a drug dealer. Mincey, 437 U.S. at 387. After the crime, police officers "conducted a four-day search of the entire apartment, which included opening drawers, closets and cupboards and inspecting their contents, emptying clothing pockets, and pulling up sections of carpet and removing them for examination," all without a warrant. Id. at 389. The Mincey Court rejected a blanket "murder scene" exception to the warrant requirement but reaffirmed the emergency aid exception and remanded the case to the Arizona Supreme Court to determine the extent to which evidence was seized within the parameters of the Fourth Amendment. Id. at 392-93. On remand, the Arizona Supreme Court upheld the admissibility of the evidence in plain view of the homicide detective who responded to the scene ten minutes after the murder. Arizona v. Mincey, 636 P.2d 637, 648-51 (Ariz. 1981). The Arizona high court concluded that the homicide detective's entry into the apartment "was merely a continuation of the initial emergency entry" by other police officers in response to the shooting, so the homicide detective "could make plain view seizures . . . of evidence he observed in plain view." Id. at 649. The O'Donnell court observed that the U.S. Supreme Court denied the defendant's petition for a writ of certiorari to review the Arizona Supreme Court's decision. O'Donnell, 974 A.2d at 425 (citing Mincey v. Arizona, 455 U.S. 1003 (1982)).

The New Jersey court in O'Donnell then summarized:

Consistent with the Supreme Court of the United States' decision in Michigan v. Tyler and the Arizona's Supreme Court's decision on remand in Mincey, the courts in other states have upheld the validity of seizures of evidence observed in plain view at a crime scene to which the police responded under the emergency aid exception, even when there is some delay between the plain view observation and seizure of the evidence and the seizure is made by different police officers than the ones who initially responded to the emergency.

O'Donnell, 974 A.2d at 42-26 (citing State v. Spears, 560 So. 2d 1145, 1147-51 (Ala. Crim. App.1989), cert. denied, 1990 Ala. LEXIS 310 (Ala. 1990); Wofford v. State, 952 S.W.2d 646, 652-54 (Ark. 1997); State v. Magnano, 528 A.2d at 760 at (Conn. 1987); Allen v. State, 638 So. 2d 577, 578-80 (Fla. Dist. Ct. App. 1994), rev. denied, 649 So. 2d 232 (Fla. 1994); State v. Johnson, 413 A.2d 931, 932-34 (Me. 1980); Wengert v. State, 771 A.2d 389, 394-401 (Md. 2001); Smith v. State, 419 So.2d 563, 568-74 (Miss. 1982), cert. denied, 460 U.S. 1047 (1983); State v. Tidwell, 888 S.W.2d 736, 740-43 (Mo. Ct. App. 1994); State v. Jolley, 321 S.E.2d 883, 886-88 (N.C. 1984); State v. Anderson, 599 P.2d 1225, 1228-30 (Or. Ct. App. 1979), cert. denied, 446 U.S. 920 (1980); State v. Martin, 274 N.W.2d 893, 896-97 (S.D. 1979); Coulter, 67 S.W.3d at 42-45; Hunter v.

Commonwealth, 378 S.E.2d 634, 635-36 (Va. Ct. App. 1989); LaFournier v. State, 280 N.W.2d 746, 748-51 (Wis. 1979)).

The O'Donnell Court quoted the Connecticut Supreme Court in Magnano for a succinct explanation of the rationale for this holding:

> [W]hen a law enforcement officer enters private premises in response to a call for help, and during the course of responding to the emergency observes but does not take into custody evidence in plain view, a subsequent entry shortly thereafter, by detectives whose duty it is to process evidence, constitutes a mere continuation of the original entry. . . . This conclusion . . . furthers the goal of effective law enforcement, and promotes the rationale and purpose of the plain view doctrine.

O'Donnell, 974 A.2d at 426 (alteration in original) (quoting Magnano, 528 A.2d at 764); see also Coulter, 67 S.W.3d at 44 (quoting Magnano, 528 A.2d at 764). On this basis, the O'Donnell court held that "the subsequent entry into defendant's apartment by the . . . investigators 'whose duty [was] to process [murder scene] evidence, constituted a mere continuation of the original entry' by the [initial] police officers who observed the evidence in plain view." O'Donnell, 974 A.2d at 427 (first and second alterations in original) (quoting Magnano, 528 A.2d at 764).

We agree with this reasoning. It would be anomalous indeed to hold that law enforcement, having lawfully entered the Defendant's home under exigent circumstances and encountered evidence in plain view, must then obtain a search warrant in order to examine that same evidence. Under the circumstances presented in this case, we conclude that the entry into the home by the officers and KPD investigators and technicians who followed Officer Shaffer constituted a "mere continuation" of Officer Shaffer's lawful entry into the home under exigent circumstances. Therefore, evidence in plain view in the home could be examined, photographed, seized and processed by them without a search warrant. We agree with the New Jersey court in O'Donnell and the Connecticut court in Magnano that this conclusion "furthers the goal of effective law enforcement, and promotes the rationale and purpose of the plain view doctrine." O'Donnell, 974 A.2d at 425 (quoting Magnano, 528 A.2d at 764). We affirm the holding of the trial court and the Court of Criminal Appeals on this issue.

*C.*

The Defendant argues that even if officers' initial entry into the home was justified by exigent circumstances, the ensuing warrantless search was limited to items in plain view. He contends that the Court of Criminal Appeals erred in applying the inevitable discovery doctrine to uphold the admission of items collected at the scene that were not in plain view of Officer Shaffer or other officers, specifically, the gold nugget ring found

in the upstairs bathroom and the knife handle and navy blue sweatshirt found in the upstairs bedroom.

"Under the inevitable discovery doctrine, illegally obtained evidence is admissible if the evidence would have otherwise been discovered by lawful means." State v. Cothran, 115 S.W.3d 513, 525 (Tenn. Crim. App. 2003) (citing Nix v. Williams, 467 U.S. 431, 444 (1984)); see also State v. Ensley, 956 S.W.2d 502, 511 (Tenn. Crim. App. 1996)). The Court of Criminal Appeals in this case first held that the items in question were not in plain view within the scope of the initial exigent circumstances search, and then considered whether the items were admissible under the doctrine of inevitable discovery. Hutchison, 2014 WL 1423240 at *17-18. In doing so, it relied on State v. Brock, 327 S.W.3d 645 (Tenn. Crim. App. 2009), in which the inevitable discovery doctrine was invoked to uphold the evidence seized from a defendant's truck. Hutchison, 2014 WL 1423240 at *18. In Brock, the defendant's truck was searched and seized before the defendant confessed to the crime. Brock, 327 S.W.3d at 686. Once the defendant confessed, this supplied police with probable cause to search the truck, so the Brock court held that the evidence illegally seized from the truck was admissible under the inevitable discovery doctrine. Id. at 686. The court in Brock commented: "This same analysis might also be said to apply to the search of [the defendant's] residence" because "[i]t is indeed inevitable that a known homicide scene with a body present would eventually have been searched by lawful means." Id. at 686 n.2. Relying on Brock in this case, the Court of Criminal Appeals noted that police officers had a "known homicide scene with a body present" and "sufficient probable cause to support a search warrant, had they sought to obtain one." Hutchison, 2014 WL 1423240 at *18. Consequently, the intermediate appellate court held that "the knife handle, sweatshirt, and [gold] ring" would have been inevitably discovered if a warrant had been obtained. Id.

We agree with the Court of Criminal Appeals' holding that the items of evidence were not in plain view and were not within the scope of the initial exigent circumstances search. However, we need not address the inevitable discovery doctrine in this case because any error in the trial court's admission into evidence of the three items not in plain view was harmless beyond a reasonable doubt.

"[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986). The harmless error doctrine "recognizes that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence." State v. Rodriguez, 254 S.W.3d 361, 366 (Tenn. 2008) (citing Van Arsdall, 475 U.S. at 681); State v. Howell, 868 S.W.2d 238, 253 (Tenn. 1993)). Further, "it promotes the public's respect for the criminal process by focusing on the underlying fairness of the trial itself rather than on technicalities or on the virtually inevitable presence of immaterial error." Rodriguez, 254 S.W.3d at 366 (citing Van Arsdall, 475 U.S. at 681); Howell, 868 S.W.2d at 253.

"[F]or the purpose of the harmless error analysis, this Court has recognized three categories of error—structural constitutional error, non-structural constitutional error, and non-constitutional error." Rodriguez, 254 S.W.3d at 371. Structural constitutional errors are not amenable to harmless error review and require automatic reversal when they occur. Id. "On the other hand, non-structural constitutional errors do not require automatic reversal and are, therefore, subject to a harmless error analysis." Id. (footnote omitted) (citing State v. Allen, 69 S.W.3d 181, 190 (Tenn. 2002)).

Where the trial court has "erred in denying the Defendant's motion to suppress the fruits of the warrantless search," this constitutes a non-structural constitutional error. State v. Ingram, 331 S.W.3d 746, 759 (Tenn. 2011). "As a non-structural constitutional error, the erroneous admission of this evidence is only harmless when it appears beyond a reasonable doubt that its admission did not contribute to the verdict obtained." Id.; see State v. Sanders, 452 S.W.3d 300, 306 (Tenn. 2014) (if the trial court commits a non-structural constitutional error, the appellate court may still "affirm the conviction if the State proves beyond a reasonable doubt that the error did not affect the verdict"). The State bears the burden of demonstrating that the error is harmless beyond a reasonable doubt. Rodriguez, 254 S.W.3d at 371.

We consider the evidence not in plain view under this standard, starting with the gold nugget ring found in the upstairs bathroom. The Defendant was convicted of facilitating first degree murder under alternate theories of premeditation and felony murder and of facilitating especially aggravated robbery. He was also convicted on one count of facilitation of especially aggravated robbery. The gold nugget ring was part of the evidence showing that the victim was robbed, but only a small part. Law enforcement was unable to obtain any fingerprints from the ring itself because it was covered in blood. The testimony at trial indicated that the victim routinely wore two rings but was only wearing one ring when his body was found. Investigator Murray observed that a void of blood on the victim's finger on an otherwise blood-covered hand indicated that the victim had been wearing a ring or something similar when he was attacked and that it was removed after the attack. Moreover, John Mitchell testified that, prior to his death, the victim had on his person at least $2000 in cash, marijuana, and "a lot" of crack cocaine. When the State showed John Mitchell a photograph of the cocaine found in the victim's sock after his death, Mr. Mitchell said that the victim had "way more" than that amount of cocaine on him before his death. Officer Shaffer testified that he had learned that people often hide drugs in their pockets, pants or underwear, and he found the victim with his pants pulled down around his knees. Most of the cash that John Mitchell said was in the victim's possession before his death was unaccounted for. When he was arrested, the Defendant had money that he did not have before the victim's death, and Ms. Cox also had a sum of money after the victim's death, the origin of which was unclear. Ms. Cox testified that the Defendant told her prior to the murder that he did not like the victim and had a plan to rob him. Ms. Cox testified that, immediately after the murder, she smoked crack cocaine. Based on our review of the evidence properly

- 31 -

admitted, the State did not need the gold nugget ring to support its theory that the Defendant robbed the victim. We hold that the admission of the gold nugget ring into evidence, even if erroneous, was harmless beyond a reasonable doubt.

We next consider the knife handle and the navy blue sweatshirt. It is undisputed that the knife *blade* remained imbedded in the victim's back when the body was discovered by law enforcement, and the handle to the knife was found elsewhere in the upstairs bedroom. The knife handle was covered in the victim's blood and technicians could find no useable fingerprints on it because of the copious amount of blood on it. No blood other than that of the victim was found on the knife handle. The navy blue sweatshirt was found in the upstairs bedroom, one of many items of clothing collected at the scene; it contributed little to the overall evidence properly admitted at trial. Officer Shaffer testified that the Defendant was covered in blood when he entered the home. DNA testing on the blood on the Defendant's person and on the clothes the Defendant was wearing when Officer Shaffer arrived showed that it belonged to both the Defendant and the victim. Considering all of the evidence properly admitted at trial, we find that the admission of the knife handle and the navy blue sweatshirt into evidence, even if erroneous, did not affect the verdict and was harmless beyond a reasonable doubt.

**Conclusion**

In summary, we conclude that the autopsy report prepared by Dr. Elkins is not testimonial under Williams v. Illinois, 132 S. Ct. 2221 (2012), and its admission into evidence at trial through the testimony of Dr. Mileusnic-Polchan did not violate the Defendant's rights under the Confrontation Clause. Dr. Mileusnic-Polchan's expert testimony, in which she relied in part on Dr. Elkins' autopsy report, likewise did not violate the Defendant's rights under the Confrontation Clause. We further hold that Officer Shaffer's entry into the home was justified by exigent circumstances, and the entry into the home by the officers and KPD investigators and technicians who followed him constituted a "mere continuation" of Officer Shaffer's lawful entry into the home. Consequently, the trial court did not err by denying the Defendant's motion to suppress the evidence found in plain view. As to the evidence not in plain view within the scope of the exigent circumstances search of the Defendant's home, we need not address the inevitable discovery doctrine because we hold that the admission of this evidence, even if erroneous, was harmless beyond a reasonable doubt. Finally, after carefully reviewing

the entire record, we find that the decision of the Court of Criminal Appeals on all other issues raised need not be disturbed and is affirmed in all other respects. The judgments of the trial court and the Court of Criminal Appeals are affirmed. It appearing that the Defendant is indigent, costs on appeal are taxed to the State of Tennessee.

_____
HOLLY KIRBY, JUSTICE