# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned On Briefs April 4, 2016

## IN RE: MASON E., ET AL.

### Direct Appeal from the Circuit Court for Sullivan County
### No. C 15015(C)     E. G. Moody, Chancellor

---

### No. E2015-01256-COA-R3-JV-FILED-MAY 16, 2016

---

The trial court found by clear and convincing evidence that Father had committed severe child abuse by knowingly exposing his three minor children to methamphetamine. Father appealed the trial court's decision to admit positive drug tests for the children into evidence and the trial court's finding of severe child abuse. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded

BRANDON O. GIBSON, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Nicolas Allen Schaefer, Kingsport, Tennessee, for the appellant, Jody E.

Herbert H. Slatery III, Attorney General and Reporter, and Michael Cameron Himes, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Stephanie Epperson Stuart, Guardian ad Litem.

## OPINION

### Background & Procedure

The State of Tennessee Department of Children's Services ("the Department") filed a petition for temporary legal custody of three minor children ("the children")[1] on

---

[1] In cases involving a minor child, it is this Court's policy to redact names in order to protect the child's identity. In this case, in order to preserve both clarity and the anonymity of the child, we will redact the names of individuals sharing the child's surname and will refer to those individuals by their given name and the first letter of their surname.

October 21, 2014, alleging that the children were dependent and neglected within the meaning of Tennessee Code Annotated section 37-1-102(b)(12). The facts underlying the Department's petition stemmed from the October 17, 2014 arrest of the children's parents, Jody E. ("Father") and Misty E. ("Mother"), for various drug offenses, including the promotion and initiation of methamphetamine ("meth"). Officers executing a search warrant of the parents' home discovered five bags of an off white substance they believed to contain meth and a multitude of items commonly used in the manufacture of meth. Additionally, law enforcement discovered, in an "outbuilding" or a shed in the yard, several more items commonly associated with the manufacture of meth, including digital scales and a spoon with residue. Immediately following the execution of the search warrant, the Department received a referral for drug exposed children and began its investigation. The Department's petition alleged that "[t]he home was in deplorable condition" and "infested with roaches and flies." The petition also described other unsanitary living conditions, such as piles of animal feces and soiled toilet paper having been observed in the children's rooms. The juvenile court granted the Department's petition on October 21, 2014, and after coming into the Department's custody and care, the children were taken to submit hair follicle samples for drug testing on October 30, 2014.

On November 6, 2014, the children were adjudicated dependent and neglected by the juvenile court through the stipulation of the parents, and the Department passed custody of the children to their maternal grandmother, who had filed an intervening petition for custody. The next day, on November 7, the Department received the children's drug screen results, which showed that two of the children tested positive for meth and amphetamines. The Department then filed a motion for an emergency restraining order, which the juvenile court granted, preventing the parents from having visitation with the children and also filed a petition urging the court to find the children severely abused pursuant to Tennessee Code Annotated section 37-1-102(21). On March 24, 2015, the juvenile court found that the children were victims of severe abuse "because the parents knowingly exposed the children [to meth] and knowingly failed to protect the children from abuse or neglect that is likely to cause serious bodily injury or death." Over the objection of Father's counsel, the court allowed into evidence the children's hair follicle drug test results and a business records affidavit made by the laboratory technician who performed the test. Father then appealed the juvenile court's ruling to the circuit court.[2]

The circuit court heard testimony and argument on June 2, 2015, and issued an order on June 18, 2015, finding that the minor children were severely abused. The court first heard testimony from Detective Ray Hayes, who executed the search warrant on the

---

[2]Mother did not appeal.

parents' home. Detective Hayes testified to finding drug paraphernalia, pills, bags containing a white substance, and pipe cutters within the home. Outside the home, near an outbuilding, Detective Hayes found a "one pot, one cook bottle [and a] hose," all items used to manufacture meth. The outbuilding itself contained a hose, fuel, muriatic acid, and a glass pipe, which Detective Hayes explained are also used to make meth. In addition to the various items and tools used to manufacture the meth, Detective Hayes observed children's toys, including "a little picnic table . . . like a little Fisher-Price or something . . ." near the outbuilding. However, Detective Hayes admitted that because the cook was not active at the time the search warrant was executed, he could not state with certainty exactly where any meth was cooked on the property or whether the children were present during a cook.

The court next heard testimony from Jeff Street, whom the court accepted as an expert in pharmacology and toxicology without objection. Mr. Street testified that he collected hair samples from all three children on October 30, 2014, placed each of those samples in a specimen container, and sent them to a lab in Illinois for testing. Mr. Street admitted that he had not been to the lab in Illinois to observe the testing process but noted that he followed the standard collection procedure used in every case and also received the lab copy of the chain of custody for these samples, which is standard even in cases where no court case is pending. Mr. Street received the results of the drug tests on November 6, 2014, which showed that two of the children tested positive for meth.

Father's counsel then objected to the Department's use of the children's drug test results, arguing that the test results were unreliable hearsay prepared in anticipation of litigation. Further, Father's counsel argued that the results themselves constituted expert testimony and were subject to the requirements set forth for scientific expert testimony in *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257 (Tenn. 1997). The circuit court determined that the children's drug tests were prepared not only for litigation but to ensure the children's medical well-being and found them to be reliable business records properly authenticated by affidavit of the laboratory technician who performed the tests. Having found Father's objection to the business records invalid, the court similarly overruled Father's objection to their admissibility based on his inability to cross-examine.

Mr. Street described the science underpinning the children's drug tests and interpreted the results for the court. In his expert opinion, because the two children tested positive for meth, but not for its parent drug, amphetamine,[3] the positive test was caused by "repeated exposure . . . in the environment due to the smoke" from the manufacture or use of meth. On cross-examination, Mr. Street admitted that it was possible to get a

---

[3]According to Mr. Street, when a user ingests or inhales meth, the user's body breaks it down into a metabolite called amphetamine.

positive result in a hair follicle test if a meth user's sweat repeatedly came into contact with the tested hair and that he could not, with a certainty, determine whether sweat or smoke was the cause in this case.

Lastly, the court heard testimony from Charles Amerson, an assistant case manager with the Department, who was part of the investigation the day of Father's arrest. Mr. Amerson generally described pictures taken at the home during the investigation and noted that he observed a swing set and children's swimming pool approximately thirty to forty-five feet from the outbuilding where the alleged meth-making tools had been discovered. Mr. Amerson also spoke to Father the day of the investigation, who admitted that he would test positive for suboxone, marijuana, and meth and that the children had been with him in the outbuilding the day before while he gutted a deer.

On June 18, 2015, the circuit court made findings of fact and issued an order finding that by clear and convincing evidence the children were dependent and neglected and severely abused within the meaning of the law. Specifically, the court found that two of the children tested positive for meth and, relying on expert testimony, found that the children "were exposed through the environment in which the father allowed them to be present where vapors or smoke was present" due to either the preparation or use of meth. The court also found that Father had admitted he would test positive for several drugs, including meth, and that the children were present in the outbuilding, where drug paraphernalia was discovered, on the day before the investigation. Father appealed.

### Issues

Father raises two issues on appeal:

I.     Whether the trial court erred in allowing drug test results into evidence without    having a representative from the laboratory present in court.

II.    Whether the trial court erred in holding that there was clear and convincing evidence to support a finding that the Appellant had committed severe child abuse against his minor children.

### Standard of Review

The supreme court has opined that it is our duty "to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

4

Clear and convincing evidence is that which eliminates any serious doubt concerning the correctness of the conclusions to be drawn from the evidence. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995). The first issue in this appeal is evidentiary in nature, thus the standard of review for that issue is whether the trial court abused its discretion. *See Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992). With these principles in mind, we turn to the substance of the appeal.

**Analysis**

**I.**

We first address Father's argument that the trial court erred in allowing the children's drug test results into evidence without having a representative from the laboratory present in court. The Tennessee Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay [evidence] is not admissible except as provided by [the Tennessee Rules of Evidence] or otherwise by law." Tenn. R. Evid. 802. Given the definition of hearsay, the children's drug test results are hearsay that is not admissible unless it satisfies an exception provided in the Rules of Evidence or some other law.

The circuit court allowed the Department to introduce the drug test results into evidence pursuant to Tennessee Rule of Evidence 803(6). "The determination of whether a hearsay statement is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." *Arias v. Duro Standard Prods. Co.*, 303 S.W.3d 256, 262 (Tenn. 2010) (citing *State v. Stout*, 46 S.W.3d 689, 697 (Tenn. 2001); *State v. Stinnett*, 958 S.W.2d 329, 331 (Tenn. 1997)). An appellate court "will not reverse the ruling of the trial court absent a showing that this discretion has been abused." *Id.* (citing *Stout*, 46 S.W.3d at 697).

Rule 803(6) defines the prerequisites for admission as follows:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . , unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this

5

paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

Tenn. R. Evid. 803(6). This exception "rests on the premise that records regularly kept in the normal course of business are inherently trustworthy and reliable." *Alexander v. Inman*, 903 S.W.2d 686, 700 (Tenn. Ct. App. 1995), *perm. app. denied*, (Tenn. July 3, 1995).

We have explained that Tennessee Rule of Evidence 803(6) includes the following five criteria that must be satisfied for a document to be admissible under the business records exception:

1.      The document must be made at or near the time of the event recorded;

2.      The person providing the information in the document must have firsthand knowledge of the recorded events or facts;

3.      The person providing the information in the document must be under a business duty to record or transmit the information;

4.      The business involved must have a regular practice of making such documents; and

5.      The manner in which the information was provided or the document was prepared must not indicate that the document lacks trustworthiness.

*Alexander*, 903 S.W.2d at 700.

Father first contends that the children's drug test results fall squarely within the *Arias* court's holding that records created with litigation in mind are not admissible under the business record exception to hearsay. In *Arias,* our supreme court concluded that a doctor's report was generated for the purpose of litigation and, therefore, inadmissible hearsay because the doctor "was not a treating physician, and his opinion was sought solely for the purpose of establishing causation [in a worker's compensation litigation]." *Arias*, 303 S.W.3d at 263. The *Arias* court expressed concern that broadly interpreting the exception would allow "litigants . . . to present expert opinion on any subject by merely introducing an expert's written report through a records custodian without ever subjecting the expert to cross examination." *Id.* Finally, the court opined that the rationale supporting recognition of the various exceptions to the hearsay rule was "to admit only hearsay evidence that exhibits inherent trustworthiness and indicia of

reliability." *Id.* (citing Neil P. Cohen, et al., *Tennessee Law of Evidence* § 8.01[3][c] at 8-12).

Having considered the children's drug test results, we conclude that the facts of this case are distinguishable from *Arias*. Whereas the business record at issue in *Arias* was generated "solely for the purpose of establishing causation," the hair follicle tests in this case were taken not only for the possibility of litigation, but to determine whether the children were exposed to any dangerous substances and, if so, that they might receive proper medical treatment. Father argues that the fact that litigation was actively pending in this case when the hair follicle tests were taken underscores their unreliability. We disagree. The Department exists to protect children who are discovered to be living in dangerous conditions. Unfortunately, that mission involves litigation. In order to protect potentially drug-exposed children, the Department is often required to administer drug tests to determine whether those children need medical treatment. However, without litigation, the Department has no legal authority to administer the tests. Therefore, it is illogical to say that the results of drug tests administered to children for the purpose of their own medical well-being are unreliable because the Department had to initiate litigation to have the children tested. The testing laboratory properly submitted a business records affidavit, demonstrating that the requirements of Rule 803(6) had been met. Based on the foregoing, we cannot say the circuit court abused its discretion in finding that the children's drug test results were admissible hearsay under the business records exception.

Father also argues, with respect to the drug test results, that the court erred in allowing the results to be entered into evidence without a representative of the laboratory present in court because he was deprived of the opportunity to cross-examine the contents of the report. According to Father, that was precisely the reason the *Arias* court held that the doctor's report in that case was inadmissible. We disagree for several reasons.

Firstly, this case is readily distinguishable from the analysis in *Arias* because the business records exception does properly apply here. In *Arias*, the Tennessee Supreme Court, as noted above, was rightly concerned with the possibility that potential expert witnesses, who had generated reports solely for litigation, could avoid cross-examination by submitting a "business record" rather than testifying. *Arias*, 303 S.W.3d at 263. The *Arias* court implicitly determined that the circumstances surrounding the lab reports at issue in that case indicated that the reports lacked trustworthiness. *Id.* Because we have already determined that the test results "exhibit[] inherent trustworthiness and indicia of reliability," that concern is inapplicable here. *Id.*

Secondly, while Father correctly notes that Tennessee Rule of Evidence 702 governs situations in which expert testimony may be required, Father misapplies the rule in his argument. The rule states,

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702. Father contends that the rule requires that the drug test results themselves require expert testimony prior to their admission into evidence. However, that is simply not how the rule operates. In the context of the rule, the properly admitted business records in this case, i.e., the test results, are evidence that "scientific, technical, or other specialized knowledge will substantially assist the trier of fact" in understanding. The *interpretation* of the test results requires expert testimony, which was provided at trial by a qualified expert witness. Further, the expert witness, Mr. Street, testified to the science underlying the drug test itself without objection; he also testified without objection to the reliability of his conclusions under the *McDaniel v. CSX Transportation, Inc.*, factors. *See McDaniel*, 955 S.W.2d at 265.

Thirdly, the fact that Father did not have the opportunity to cross-examine the technician who actually performed the tests themselves did not impair Father's rights in this case. Our supreme court recently addressed a similar issue in the criminal context in *State v. Hutchison*, 482 S.W.3d 893 (Tenn. 2016). In that case, the trial court admitted an autopsy report absent the presence of its author and allowed another doctor who did not perform the autopsy to testify about the report. *Id.* Wary of a result that violated the United States Constitution's Confrontation Clause,[4] the *Hutchison* court looked to the United States Supreme Court's decision in *Williams v. Illinois*, —— U.S. ——, 132 S. Ct. 2221 (2012), for guidance. The four-Justice plurality opinion in *Williams*, authored by Justice Alito and joined by Chief Justice Roberts and Justices Kennedy and Breyer, "utilized a primary purpose test described as 'an objective test' in which the court looks at the 'primary purpose that a reasonable person would have ascribed to [an out-of-court statement], taking into account all of the surrounding circumstances.'" *Hutchison*, 482 S.W.3d 893 (Tenn. 2016) (quoting *Williams*, 132 S. Ct. at 2243). The plurality's primary purpose test focused on whether the out-of-court statement had "the primary purpose of accusing a targeted individual."

Applying the reasoning supplied in *Williams*, the *Hutchison* court determined that an autopsy report prepared in the normal course of business did not have the primary purpose of accusing a targeted individual but determining how a victim died. *Hutchison*, 482 S.W.3d 893 (Tenn. 2016). The court then concluded that the autopsy report's admission into evidence at trial did not violate the defendant's rights under the

---

[4]Because this is not a criminal case, the Confrontation Clause does not apply here.

Confrontation Clause. *Id.*

While this is not a criminal case and the Confrontation Clause does not apply here, we recognize that a finding of severe abuse has the potential to affect Father's constitutional right to parent his children. However, based on our review of the record and our understanding of the Tennessee Supreme Court's decision in *Hutchison*, we conclude that the trial court did not err in allowing the drug test results into evidence, even if subjected to constitutional scrutiny. The drug test results at issue cannot be said to have the primary purpose of accusing a targeted individual. Taken by themselves, the test results only show that two of the children tested positive for meth. The test results do not, nor could they, point to the guilt of a particular individual at trial. Like the autopsy report in *Hutchison*, the children's test results provide information regarding only the medical state of the individual tested.[5] Simply, we cannot say that the circuit court abused its discretion in allowing the drug test results to be admitted into evidence.

## II.

We next address Father's contention that the trial court erred in finding that the children were the victims of severe child abuse within the meaning of the law by clear and convincing evidence. Tennessee Code Annotated section 37-1-102(b)(21)(A)(i) defines severe child abuse as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death." Serious bodily injury is defined by the statute[6] as including, but not limited to,

> second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

Tenn. Code Ann. § 39-15-402(d). This Court has previously upheld findings of severe child abuse where children were present in a place where their parents manufactured meth. *See In re Sandra M.*, No. 2011-01719-COA-R3-PT, 2012 WL 3201942 (Tenn. Ct. App. Aug. 7, 2012); *In re Meagan E.*, No. E2005-02440-COA-R3-PT, 2006 WL

---

[5]The *Hutchison* court also noted its agreement with a sister court that "an autopsy report prepared in the normal course of business of a medical examiner's office is not rendered testimonial merely because the . . . medical examiner performing the autopsy is aware that police suspect homicide and that a specific individual might be responsible." *Id.* (quoting *People v. Leach*, Ill. Dec. 477, 980 N.E.2d 593).

[6]Tenn. Code Ann. § 37-1-102(b)(21)(A)(ii) states that "serious bodily injury" shall have the meaning given in § 39-15-204(d).

9

1473917 (Tenn. Ct. App. May 30, 2006). While the facts of *Meagan E.* were analyzed under section 37-1-102(b)(21)(D),[7] rather than subsection (21)(A), the reasoning provided therein is instructive to this case. In *Meagan E.*, we noted that "the chemicals used to manufacture meth are highly flammable and can lead to explosions and severe burns. Many chemicals, such as iodine and red phosphorous, are also highly poisonous." 2006 WL 1473917, at *5. In *Sandra M.*, we upheld a finding of severe child abuse under both subsections (21)(A) and (21)(D) based on the fact that the children were knowingly permitted to be present within a structure where meth was created. 2012 WL 3201942, at *3.

Here, the circuit court found that two of the children tested positive[8] in their hair follicle drug screen for meth and that the "children were present in the home and at least two of them were present in the shed where items were found that are related to the manufacture of [meth]." The discovery of "several 'one pot' cooking bottles, gasser bottles, pipe cutters used to extract lithium stripes from batteries, Drano used in the cook bottles and other items" in conjunction with two of the children testing positive for meth through environmental exposure "eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence" by the circuit court in this case. *See O'Daniel*, 905 S.W.2d at 188. By Father's own admission, the children were present in the outbuilding, where items used to manufacture meth were discovered, the day before Father's arrest and the Department's investigation. Thus, the trial court heard clear and convincing evidence that Father knowingly exposed his children or knowingly failed to protect his children from an environment that is likely to cause serious bodily injury or death. The evidence does not preponderate against the facts found by the court to underpin its determination that Father committed severe child abuse. Accordingly, we affirm the circuit court's finding that Father committed severe child abuse.

## Conclusion

For the foregoing reasons, the judgment of the circuit court is affirmed. Costs of

---

[7](D) Knowingly allowing a child to be present within a structure where the act of creating methamphetamine, as that substance is identified in § 39-17-408(d)(2), is occurring.

[8]While Father did argue in his Reply Brief that "the record is silent to clear and convincing evidence . . . to what degree the minor children were exposed to methamphetamine, as only two of the children tested positive when all the children had been playing in the area," he did not raise as an issue that the third child's lack of a positive meth screen might prevent a finding of severe abuse.

this appeal are taxed to the Appellant, Jody E.  Because Jody E. is proceeding *in forma pauperis*, execution may issue for costs if necessary.


                                               _____

                                               BRANDON O. GIBSON, JUDGE