IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 13, 2021

## WESLEY H. LUTHRINGER v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Bedford County
No. 18086 PC    Forest A. Durard, Jr., Judge**

_____

### No. M2020-00503-CCA-R3-PC

_____

The petitioner, Wesley H. Luthringer, appeals the denial of his petition for post-conviction relief, which petition challenged his convictions of aggravated vehicular homicide, alleging that the trial court erred by denying his motion for new counsel and that he was deprived of the effective assistance of trial counsel. Discerning no error, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and CAMILLE R. MCMULLEN, J., joined.

Jonathan Brown, Fayetteville, Tennessee, for the appellant, Wesley H. Luthringer.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Robert J. Carter, District Attorney General; and Mike Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Bedford County Grand Jury charged the petitioner with two counts of vehicular homicide and four alternative counts of aggravated vehicular homicide for the deaths of Ronald Neely, Jr. and Donald Lazas III. *State v. Wesley Howard Luthringer*, No. M2016-00780-CCA-R3-CD, slip op. at 1-2 (Tenn. Crim. App., Nashville, Feb. 6, 2017).

The evidence presented at trial showed that on February 24, 2014, the petitioner was driving a Kia Sedona minivan in which Mr. Neely and Mr. Lazas were passengers along Highway 82 East in Bedford County, when the vehicle made a "'sudden jerk to the right,'" crossed the center line[,] and "began sliding and created tire marks." *Id.*, slip op. at 3-4. The vehicle created a "gouge area" in the ground, "became airborne[,]

and traveled approximately [22] feet before hitting three trees and coming to a stop." *Id.*, slip op. at 4. While airborne, the vehicle rotated causing the hood and roof of the vehicle to hit the side of a tree approximately eight feet from the ground. *Id.* The petitioner was found pinned in the driver's seat, wearing a seatbelt and "wedged between the steering wheel and the dash." *Id.*, slip op. at 2. One deceased victim was found "on the roof of the vehicle," and the other deceased victim was found "'partially ejected [lying] prone . . . in the dirt with the vehicle crushed on top of him.'" *Id.* (first alteration in original). A strong smell of alcohol emanated from the petitioner's person. *Id.*, slip op. at 2-3. First responders found beer cans around the outside of the vehicle, and, when the van was rolled to its upright position, "beer cans rolled out of the vehicle." *Id.* The petitioner's blood test—performed after he had been administered saline, which "'could [have] potentially dilute[d] the blood alcohol [content]'"—revealed a blood alcohol content of 0.21. *Id.*, slip op. at 6 (alterations in original).

The jury convicted the petitioner as charged, and the trial court merged the appropriate offenses. After a sentencing hearing, the trial court sentenced the petitioner to an effective 48-year sentence. On appeal, this court affirmed the petitioner's convictions and sentence. *Id.*, slip op. at 1-11.

In April 2017, the petitioner filed a timely pro se petition for post-conviction relief. After the appointment of counsel, the petitioner filed an amended petition.[1]

The petitioner was represented by two attorneys at trial.[2] Both attorneys were subpoenaed to appear for an evidentiary hearing, but co-counsel was unable to appear due to health issues. The post-conviction court continued the hearing and permitted the petitioner to take co-counsel's testimony by deposition. The petitioner attempted to do so, but co-counsel's health had deteriorated to a point that he was unable to participate in a deposition. At the time of the October 2019 evidentiary hearing, the petitioner had been unable to depose co-counsel, and the evidentiary hearing proceeded without his testimony.

At the evidentiary hearing, the petitioner testified that trial counsel and co-counsel represented him at trial and that "they were always together" when he spoke with them. He was incarcerated in Henning prior to his trial, and his attorneys came to see him only once, "[n]ot long before trial," staying only "[f]ive minutes maybe." During that five-minute meeting, counsel told him that the case was going to trial and that "'it pretty much

---

[1]    Present counsel is the third attorney appointed to the petitioner's post-conviction proceedings. Through counsel, the petitioner filed three amended post-conviction petitions, the final of which incorporated by reference the entirety of the original pro se petition. Consequently, the post-conviction court considered only the claims raised in the pro-se petition and the final amended petition.

[2]    Because only one trial attorney testified at the evidentiary hearing, we will refer to the testifying attorney as "trial counsel" and the non-testifying attorney as "co-counsel."

looks like they've got you.'" The petitioner said that he came to court several times leading up to his trial and that he met with counsel on those dates but that those meetings were "[n]ot long." He acknowledged that counsel had told him that the State had offered a plea agreement with a 40-year sentence with a "high percentage" to serve before release eligibility but said that he "quickly refused that" and that they did not discuss making a counteroffer. The petitioner denied that counsel discussed trial witnesses, trial preparation, or a defense strategy with him, stating that "[t]here was no strategy." He said that counsel never discussed with him whether he was driving the vehicle at the time of the wreck but that they just "said it looks like I was." He explained that he sustained "a bad brain injury" in the accident and that he did not "remember anything."

The petitioner testified that counsel sent him only part of the discovery materials, consisting of autopsy and medical reports and that neither attorney reviewed the materials with him. As to "[p]retty much" all trial exhibits, including "[s]ome diagrams and some pictures and reports," the petitioner said that he "[n]ever saw them until trial." He testified that, at a pretrial hearing on June 15, 2015, he "was trying to fire my attorneys" because "they hadn't worked. They hadn't tried to do anything for me." He told the trial court that he was aware that counsel had received "over 400 pages" of documents in discovery materials but that they had sent him only 20 pages. The petitioner said that before trial, he did not think that he had been driving the vehicle at the time of the crash and said that if counsel had reviewed the discovery materials with him and had shown him the photographs indicating that he was driving, he would have given a plea offer greater consideration. Instead, he "thought I was innocent when I went to trial."

The petitioner averred that counsel failed to object to the State's asking leading questions during direct examination of witnesses at trial. The petitioner believed that the State "was coaching the witnesses to get the answers he wanted out of them." He said that counsel also failed to object to the State's indicating by its questions certain facts that were not in evidence. He testified that co-counsel relied on the eighth edition of the Tennessee Pattern Jury Instructions whereas the trial court relied on the 19th edition and that co-counsel's failure to stay up to date on the law concerned him.

During cross-examination, the petitioner acknowledged that counsel mailed him some discovery materials but denied that those materials included the diagrams or reports from the Critical Incident Response Team's investigation. He conceded that he received copies of the victims' autopsy reports and the medical records from his treatment after the accident but said that counsel did not point out to him the portion of the medical report that indicated that he was removed from the driver's seat of the vehicle. He reiterated that "nobody ever went over anything with me." The petitioner acknowledged that he wrote a letter to co-counsel on July 5, 2015, in which he stated that he wanted counsel "to find out who made these medical statements I found, and have them supena'd

-3-

[sic] to court." The petitioner said that, because of his brain injury, his "short term memory is gone" and that he could not remember to what medical statements he was referring in the letter. He denied that counsel pointed out to him the statements in the medical reports that indicated that he had been driving. He said that he did not know until trial that the State had two witnesses to testify that he was removed from the driver's seat at the scene of the crash. The petitioner said that he "didn't think I was driving until I went to trial" and heard the evidence.

The petitioner acknowledged that his blood alcohol level was .21 at the time of the crash but denied that counsel explained to him that his high blood alcohol content and his prior DUI convictions allowed the State to charge him with aggravated vehicular homicide rather than merely vehicular homicide. He testified that counsel explained to him the elements of vehicular homicide but that they did not discuss the additional elements of aggravated vehicular homicide. He also denied that they discussed the possible effect of his prior DUI convictions on his sentences, stating, "I didn't hear about that until sentencing." The petitioner acknowledged that it was possible that his not remembering counsels' explaining certain things to him was the result of his memory loss and not because they failed to do so.

The petitioner acknowledged that in his July 2015 letter to co-counsel, he asked co-counsel to work on a plea agreement in which he would plead guilty to vehicular homicide if the State would agree to "drop the aggravated." He also acknowledged that in a June 2015 hearing, he told the trial court that he could not plead guilty because he could not remember what happened the night of the crash. He reiterated that counsel did not discuss any trial strategy with him but acknowledged that he could not provide counsel with any helpful information about the night of the crash because of his memory loss. He acknowledged that the State's evidence would be hard for him to defend against but suggested that there were other arguments that counsel could have made.

The petitioner said that counsel had not explained to him that each aggravated vehicular homicide charge carried a potential sentence of 15 to 25 years. The petitioner said that, had he known his sentencing exposure, he would have "[m]aybe" accepted a plea offer but then said, "I thought I was innocent. I wouldn't have took one year right then." He said that even knowing all of the evidence that the State presented at trial, he "probably still wouldn't have took" a plea offer and "would have still took it to trial probably."

When pressed, the petitioner admitted that he looked at sentencing information available in the facility where he was incarcerated pretrial and knew that aggravated vehicular homicide was a Class A felony that carried a 15- to 25-year sentence for a Range I offender. He reiterated, however, that counsel never discussed the matter with him. He explained that he mentioned a best interest plea in his July 2015 letter to

counsel because other inmates told him "these things to write and ask for." He denied that counsel discussed such a plea with him. He acknowledged that co-counsel had written him a letter on July 23, 2015, in which co-counsel said that the State was considering his plea offer but had not yet made a decision.

The petitioner took issue with counsels' relying on an out-of-date edition of the Tennessee Pattern Jury Instructions but acknowledged that they were not surprised by the language of the jury instructions given by the court.

Trial counsel testified that he and co-counsel worked as a team on the petitioner's case. He could not recall a time that either attorney met with the petitioner alone, saying, "I think we were both together about every time." Trial counsel stated that they met with the petitioner "numerous times" between his arraignment and trial. He explained that he and co-counsel did not have delegated roles on the case but "just worked on it as a team," sharing equal responsibility.

Trial counsel testified that he and co-counsel sent the petitioner all of the discovery materials, noting that initially, they had only the autopsy reports and "the general discovery"; they did not receive the petitioner's medical reports until sometime later. He said that the petitioner's medical records were given to the petitioner on June 17, 2015. He emphasized that he and co-counsel discussed with the petitioner "everything involving the case on numerous occasions." Trial counsel said that they reviewed the petitioner's medical records and his medical condition and that the petitioner "told us numerous times that he couldn't remember anything about the brain damage . . . . And we went over with him that he had a .21 BAC . . . ." Trial counsel also said that they discussed with the petitioner that his medical records indicated that he was driving the vehicle but that the petitioner indicated that he did not remember driving and "kind of waffled a little bit."

Trial counsel testified that the petitioner raised the possibility of "a best interest plea but he didn't want to take 40 years. And so he said he didn't feel like he could plead guilty since the State wouldn't come down any lower." Counsel discussed a plea offer with him pursuant to which the State offered 40 years at 30 percent release eligibility. Trial counsel said that they investigated the petitioner's suggestion that certain family members could testify that he was not driving at the time of the crash but that two of those witnesses did not have knowledge of the matter and a third witness saw Mr. Neeley drive away in the vehicle prior to the crash but did not witness the crash. Counsel said that the evidence indicated that the defendant was driving at the time of the crash.

Trial counsel testified that either he or co-counsel "grabbed what Pattern Instructions we saw at the office" before going to trial unaware that they had taken an outdated edition. He denied that their bringing the outdated edition to court had any impact

-5-

on the trial because the trial court had an updated version on which the parties based their discussion of the jury instructions.

Trial counsel said that they did not consider hiring expert witnesses because "an expert is not going to be able to say if there was any sort of intervening cause. And that was pretty much the only viable defense since he was driving the car." He also said that they argued at trial that an intervening event, such as a deer running in front of the vehicle, could have been the cause of the accident, but he reiterated that an expert would not have strengthened that argument.

Trial counsel explained that they did not object to the State's using a supervising doctor to admit the autopsy reports rather than the doctor who performed the autopsies because "there's case law that says that's fine." He also said that the cause of death of the victims was not in question. Trial counsel said that the State did not ask leading questions of witnesses on direct examination.

Trial counsel acknowledged that, in a June 2015 hearing, the petitioner raised his dissatisfaction with the extent of counsels' communication with him but said that they "were talking to him about everything." After that hearing, trial counsel and co-counsel "made sure that we had sent everything to him and then . . . we s[aw] him at the jail while he was here and went to see him in Henning and then saw him before trial." Trial counsel explained that it was not his practice to send all discovery materials to every client "because some of them don't want it." Instead, it was his practice to fully discuss all of the materials with the client but to send copies only if requested. Trial counsel said in this case, they sent the petitioner the initial discovery materials and sent the remaining materials when the petitioner asked for them.

During cross-examination, trial counsel testified that it could take a long time to get certain discovery materials, "especially from hospitals because hospitals are notoriously slow for giving information to either the State or Defense attorneys." When he and co-counsel met with the petitioner, they reviewed any discovery materials that they had received since their last visit. Trial counsel said that it was his usual practice to meet with a client after arraignment to "go over what the charge is, what level of punishment it carries; talk about the elements; talk about the facts of the case." He stated that he explained to the petitioner his potential sentencing exposure. He recalled that the State made a plea offer with an effective 40-year sentence but that the State was unwilling "to budge very much at all" in this case.

Trial counsel said that the petitioner remembered "very little" about the night of the accident because of his head injury. He reiterated that the potential witnesses identified by the petitioner could not provide helpful information, noting that "there was

-6-

no way to get around the fact that" the petitioner was "pulled . . . out from beneath . . . the driver's dashboard." Trial counsel explained that calling an expert witness to testify about the possible speed the petitioner was driving at the time of the crash would not have benefited the defense because the evidence showed that the vehicle's "brakes were not locked up" and that "the vehicle went flying 20 feet in the air," which indicated that it was traveling "at a high rate of speed." Trial counsel said that this was a case with a "lot of bad evidence" against the petitioner and very little evidence supporting a defense.

Trial counsel also said that, because the petitioner could not remember anything of the night of the crash, he could not enter an open plea because the trial court would not accept a guilty plea if the petitioner could not admit guilt. Trial counsel testified that they discussed the possibility of a best interest plea and that the petitioner was willing to enter a best interest plea for a 15-year sentence, but the State did not agree.

Trial counsel said that the parties discussed the jury instructions with the trial court. The court supplied the parties with copies of the intended jury instructions and asked for the parties' input. Trial counsel said that the court's instructions were "up to date" and followed the "most recent" edition of the pattern jury instructions. He did not find any error in the court's jury instructions.

Upon questioning by the court, trial counsel clarified that there was a discussion about the correct language to use in the jury charge regarding circumstantial evidence and that co-counsel favored out-of-date language, but the trial court used the current language in the charge it gave to the jury.

At the close of the hearing, the post-conviction court took the matter under advisement. In its written order denying relief, the post-conviction court found that the petitioner had failed to establish that he was entitled to new counsel before trial or that his defense at trial was prejudiced by the trial court's denial of his motion for new counsel. The post-conviction court concluded that counsel did not perform deficiently, finding that the direct examination questions to which the petitioner asserts that counsel should have objected were either not leading questions or, to the extent that they may have been leading, were not suggestive of an answer and did not prejudice the petitioner's trial. Further, the post-conviction court concluded that the State properly admitted the victims' autopsy reports into evidence via a doctor who did not perform the autopsies. As to the petitioner's remaining claims, the post-conviction court concluded that the petitioner had failed to establish prejudice.

In this timely appeal, the petitioner reasserts his claims that he was denied his constitutional right to counsel at trial because the trial court denied his motion to appoint new counsel and because he was deprived of the effective assistance of counsel at trial.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation omitted), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Initially, we note that the petitioner's claim that the trial court erred by denying his pretrial motion for substitution of counsel qualifies as waived because the petitioner did not present the issue as a ground for relief on direct appeal. *See* T.C.A. § 40-30-106(g) ("A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented . . . ."); *Brown v. State*, 489 S.W.2d 268, 270 (Tenn. Crim. App. 1972) ("All trial questions are first determined in the trial court. If the losing party chooses to accept that determination without appeal, it is as final and binding as if affirmed by the highest appellate court.").

To the extent that the petitioner argues that counsel was ineffective for failing to raise the issue in the motion for new trial and on appeal, the petitioner has failed to show that he was prejudiced by that omission. At a hearing in June 2015, the petitioner asked the trial court to appoint new counsel because he alleged that trial counsel and co-counsel had not spoken with him in a year and had not provided him with all discovery materials. The trial court continued the trial to a later date because a superseding indictment was issued and ordered the petitioner, who was incarcerated at the time, to be held locally for a few days to allow his counsel time to meet with him and to review discovery materials. Thus, the trial court addressed the petitioner's concerns, albeit via an avenue other than appointment of new counsel. Furthermore, as we will discuss more thoroughly below, the petitioner's attorneys were not ineffective, and, consequently, the petitioner cannot establish that the trial court's denial of his motion for new counsel prejudiced him at trial.

Here, the petitioner has failed to establish deficient performance by counsel or that he was prejudiced by counsels' representation. During the evidentiary hearing, the petitioner testified that he did not understand his sentencing exposure or know that the State's evidence would show that he was driving the vehicle; however, the petitioner also said that he learned of his sentencing exposure through means other than counsel and that, even if he had known all of the relevant information during plea negotiations, he likely would not have accepted a plea offer. Also, the petitioner asserts that his attorneys were generally unprepared for trial as indicated by their use of an old edition of the Tennessee Pattern Jury Instructions and co-counsel's allegedly unprofessional conduct, but the petitioner has failed to show what counsel could have done differently that would have benefited his defense. Counsel investigated the meager leads that the petitioner was able to provide, the trial court relied on a current edition of the Tennessee Pattern Instructions in preparing the jury charge, and the petitioner has pointed to no specific evidence or trial strategy that counsel could have discussed with him that would have achieved a different outcome. That the petitioner may have been more confident in counsels' representation had they communicated with him more frequently and brought the current version of jury instructions to court is irrelevant to the outcome of the trial.

Furthermore, we agree with the post-conviction court that, to the extent that the State asked leading questions on direct examination, the questions did not suggest particular answers and did not rely on facts not yet in evidence. For example, the petitioner alleges that Trooper Barry Qualls had not yet identified the petitioner as an occupant of the vehicle when the State asked: "And you've indicated that this third person was the [petitioner]?" The record reveals, however, that Trooper Qualls had already testified: "When Mr. Story was in the vehicle checking for the pulse of Mr. Lazas, that's when he heard the [petitioner] moaning. That's how we knew that there was a third person inside the vehicle." The State's question did not go beyond confirming what Trooper Qualls had already said. The only question that directly provided an answer for the witness was when the State asked Trooper Qualls if one of the victims was from Sparta, Tennessee. Even if counsel had objected to the use of this leading question, the name of victim's hometown had no bearing on the outcome of the trial.

As to counsel's failure to object to the State's offering the victims' autopsy reports into evidence via a supervising doctor, trial counsel testified that there was no legal basis on which he could object. Our supreme court has held that an autopsy report may be properly admitted through an appropriate expert witness other than the doctor who performed the autopsy. *See State v. Hutchison*, 482 S.W.3d 893, 914-15 (Tenn. 2016). Additionally, trial counsel indicated that he did not object to the admission of the autopsy reports because the victims' cause of death was not at issue. This is precisely the sort of strategic decision left to the discretion of counsel.

Similarly, trial counsel testified that he did not call an expert witness because he did not believe it to be beneficial to the defense. Again, this is a decision left to the professional judgment of counsel, and we will not now second guess that strategy. Moreover, because the petitioner failed to present at the evidentiary hearing the testimony of the proposed expert witness, the petitioner has failed to establish that he was prejudiced by counsels' decision to forgo the use of an expert witness. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). Consequently, the petitioner has failed to establish any instance of deficient performance by counsel.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-10-